UPSON NUT CO. v. AMERICAN SHIPBUILDING CO.

(District Court, N. D. Ohio, E. D. July 12, 1918.)

No. 9327.

1. COURTS ⟨⟩342—EQUITABLE DEFENSE IN ACTION AT LAW—REFORMATION.
　　Where plaintiff sued at law for breach of contract, it was admissible for defendant by cross-petition to seek reformation of the contract, under Judicial Code, § 274b, as added by Act March 3, 1915.

2. REFORMATION OF INSTRUMENTS ⟨⟩45(1)—EVIDENCE REQUIRED.
　　To warrant reformation of written instrument for mistake provable only by oral testimony, the evidential force of the written contract must be clearly and adequately overcome; but if the contract written was highly improbable, and one for which there was no motive, necessity, or consideration, a relatively small amount of clear and credible evidence will establish the mistake.

3. REFORMATION OF INSTRUMENTS ⟨⟩45(2)—EVIDENCE REQUIRED.
　　If a written contract was the reduction of preliminary written negotiations, only a mutual mistake in the reduction of the agreement to writing need be established to warrant reformation.

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. SALES ⊚⟿36—MISTAKE OF LAW.
    Where plaintiff purchased defendant's accumulation of steel scrap, approximating 8,200 tons, and mailed an order in usual form, which called for the exact amount of 8,200 tons, plaintiff's mistake in assuming that the agreement called for an exact tonnage was one of law, and, not being disclosed to defendant, did not modify the written terms of the original contract.

5. REFORMATION OF INSTRUMENTS ⊚⟿45(2)—CONTRACTS—EVIDENCE—SUFFICIENCY.
    Evidence *held* to warrant reformation of written contract for sale of 8,200 tons of steel scrap, to conform to the original contract embodied in letter by which defendant offered to sell and plaintiff agreed to buy defendant's accumulation of steel scrap, approximating 8,200 tons.

6. REFORMATION OF INSTRUMENTS ⊚⟿25—RIGHT TO REMEDY.
    Defendant, having agreed to sell its accumulation of steel scrap, honestly but mistakenly estimated at 8,200 tons, could not be denied relief of reformation of the contract, so as to call for its accumulation, approximating 8,200 tons, when the contract as finally reduced to writing called for the exact amount of 8,200 tons.

7. REFORMATION OF INSTRUMENTS ⊚⟿32—RIGHT TO REMEDY—EFFECT OF LACHES.
    Where contract expressed by letters called for sale of defendant's accumulation of steel scrap, approximating 8,200 tons, and plaintiff's order blank called for the exact amount of 8,200 tons, laches could not be imputed to defendant, after receiving the order, in failing to notify plaintiff that it would deliver only its accumulation, since defendant could not be held to anticipate that plaintiff would make a claim other than that embodied in the contract as originally written.

At Law. Action by the Upson Nut Company against the American Shipbuilding Company, wherein defendant filed cross-petition. Decree for defendant upon its cross-petition.

Cook, McGowan, Foote, Bushnell & Lamb, of Cleveland, Ohio, for plaintiff.

Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio, for defendant.

WESTENHAVER, District Judge. This action was begun in the state court and removed here because of diversity of citizenship. Plaintiff's petition herein alleges in a first cause of action that on or about October 12, 1915, it entered into a contract in writing with defendant whereby it agreed to buy and the defendant agreed to sell 4,200 gross tons steel scrap, to be shipped at a rate not exceeding four cars a day, from the accumulation defendant then had on hand at its Cleveland yard; and in a second cause of action it alleges a similar contract of the same date for 4,000 gross tons steel scrap, to be shipped at a rate not exceeding four cars a day from the accumulation then had on hand at its Lorain yard. It is further alleged that plaintiff received only 2,685.50 tons from the Cleveland yards, leaving 1,514.50 tons undelivered, and that it received only 3,706.47 tons from the Lorain yards, leaving 293.53 tons undelivered, and that defendant has refused to make further deliveries on either contract.

[1] Defendant has added to its answer what is therein called a

⊚⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

second defense and cross-petition, seeking reformation of these two written contracts on the ground of a mutual mistake of the scrivener in reducing to writing the true and actual agreement of the parties as made. This method of pleading an equitable cause of action by answer in the nature of a cross-petition, rather than by an independent suit in equity, is now permissible under section 274b, an amendment to the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1164) approved March 3, 1915 (Act March 3, 1915, c. 90, 38 Stat. 956 [Comp. St. 1916, § 1251b]). The issues arising upon this cross-petition have been tried to the court in advance of the trial of the issues in the law action.

Defendant's contention, in brief, is that the actual agreement made with the plaintiff was one for a sale of its then present accumulation of steel scrap at its Cleveland yards, approximating 4,200 gross tons, and a like sale of its present accumulation of similar material at its Lorain yards, approximating 4,000 gross tons, and that, after this agreement had been made by the parties, plaintiff's bookkeeper, acting as a scrivener, in preparing the two written contracts sued on, through inadvertence or mistake, failed to embody correctly therein the terms of the actual contract, but, instead, through mistake or inadvertence, framed the contracts so as to make them a sale of 4,200 gross tons of steel scrap from the accumulation on hand at the Cleveland yards, and 4,000 gross tons from the accumulation on hand at the Lorain yards.

The materiality of the mistake, if one such was made, is quite apparent. If the contract should be reformed as defendant contends, it has performed it by delivering its accumulation of steel scrap, both at its Cleveland yards and at its Lorain yards; but, if not reformed, it probably remains liable for plaintiff's damage due to nondelivery. Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622; Inman Bros. v. Dudley & Daniels Lumber Co. (6 C. C. A.) 146 Fed. 449, 76 C. C. A. 659.

[2] The principles and conditions under which equity will reform a written contract for mutual mistake are well settled, and counsel do not really differ as to what they are. All will agree that written contracts can only be reformed when the mistake is proved by clear and satisfactory evidence of such cogency as will satisfy the court. A sufficient statement of these principles and of certain rules for weighing and appraising evidence in such a suit will be found in Biser v. Bauer (6 C. C. A.) 205 Fed. 229, 123 C. C. A. 417. Thus it appears if the evidence of the mistake depends upon oral testimony and the recollection of witnesses, or if the written contract is itself the result of adversary negotiations and the only embodiment of the terms in writing, then the evidence will not be regarded as clear and satisfactory, unless the evidential force of the written contract itself is clearly and adequately overcome. On the other hand, if the environment and the motive of the parties, the consideration and the necessities to be met, make the contract as it is written a highly improbable one, one for which there was no motive, or necessity, or consideration, then the writing has little self-supporting force, and a

relatively small amount of clear and credible evidence will establish the mistake.

[3]. So, likewise, if a contract was actually made, and this is evidenced by preliminary documents, and the charge is that the mistake was in embodying these preliminary terms in the more formal written document subsequently signed, the written document has little self-supporting force, and will be much more easily overcome than when the mistake is to be established by oral evidence, especially when the mistake inheres in the contract itself and not in the embodiment thereof in the final written form. In the last analysis the mistake must be mutual, but in the class of cases last referred to it is necessary only to allege and prove a mistake in the reduction of the agreement to writing, and not a mistake in the making of the contract itself.

In the instant case nearly all the testimony is embodied in five letters exchanged between the plaintiff and defendant; indeed, it may be said that all the controlling, if not all material, evidence is contained therein. This evidence, briefly summmarized, shows the following facts:

Prior to September 29, 1915, and during the preceding five years, defendant had accumulated at six different shipbuilding yards on the Great Lakes, among them its yards at Cleveland and Lorain, Ohio, certain quantities of what is known as steel scrap. This scrap consisted of plate and shape shearings, punchings, and scrap rivets and bolts. It had carefully estimated the quantity of such scrap for inventory purposes at 4,146 gross tons in its Cleveland yards, and 4,016 gross tons in its Lorain yards. Prior to this date there had been no market or demand for scrap. On September 29, 1915, defendant sent to the plaintiff and others a letter in which it said:

"We estimate that we have on hand at the present time approximately the following amount of steel scrap at the points mentioned."

Among the points thus mentioned were the Cleveland and Lorain yards. This letter further stated:

"A proposition is requested on all or any portion of this scrap you could use."

Opportunity is offered to examine the scrap, and a desire is expressed to close up the matter within the next week or ten days. The plaintiff, by Mr. Bingham, its representative, acknowledges receipt of this letter under date of September 30, 1915, and expresses an intention to submit a proposition, and a hope that it might be able to secure at least a portion of the scrap.

Some testimony was offered as to whether or not Mr. Bingham, before submitting the proposition as requested, examined this scrap in person. There is some conflict in the testimony on this point; but whether he did so or not is, it seems to me, immaterial. Both sides agree that he did not see the scrap at the Lorain yards, and he himself admits that he saw a part of that in the Cleveland yards by looking through a fence, and that he visited the yards and saw it in this manner before plaintiff's proposition was submitted. The remaining three letters are of such vital importance that I quote them in

full, omitting only the printed letter heads.    The first from plaintiff to defendant reads as follows:

"Cleveland, Ohio, October 8, 1915.

"American Shipbuilding Co., Mr. N. S. Thrasher, Pur. Ag't, Cleveland—Gentlemen: confirming phone conversation of to-day, we are pleased to offer you, for your present accumulation of steel scrap at your Cleveland plant, which you say approximates 4,200 gross tons, $14 per gross ton f. o. b. cars your works.  As advised, we would prefer to handle only this quantity of scrap, but are glad to offer you $13.75 f. o. b. cars your plant, Lorain, Ohio, for your accumulation of similar material, approximating 4,000 tons.  These prices are made with your assurances that, in the event of our obtaining one or both lots, you will ship the material no faster than at the rate of four cars per day, and we hope you will be able to slightly decrease this rate.  This proposition, we understand, will be decided within the next few days.  Trusting that we shall be able to secure the material, we remain,

"Yours very truly,                     The Upson Nut Company,
                                       "H. P. Bingham, Ass't Treasurer."

This is stamped by defendant:

"Received Oct. 9, 1915, Purchasing Dept.  Answered 10/12/15."

The answer referred to is as follows:

"Cleveland, Ohio, October 12, 1915.

"The Upson Nut Company, Mr. H. P. Bingham, Asst. Treasurer, City—Dear Sir: Referring to your letter of the 8th instant, and confirming telephone conversation with you, this p. m., we hereby accept your proposition to take from us our present shipyard steel scrap accumulation, consisting of plate and shape shearings and punchings and scrap rivets and bolts, at our Cleveland and Lorain plants, estimated at about 8,150 tons, at the following prices, terms, and conditions: For the Cleveland portion—$14.00 per gross ton f. o. b. cars our Cleveland shipyard; for the Lorain portion—$13.75 per gross ton f. o. b. cars our Lorain shipyard.  Terms: Net cash thirty days.  Scrap to be shipped at the rate of not to exceed four cars per day, all told, starting at once, and continuing until completed.  Scrap to be billed to you as shipped.

"Please give us immediately a written confirmation of this order, and also give us definite shipping instructions for the material from each plant.

"Very truly yours,                     N. S. Thrasher, Purchasing Agent."

The request for a written confirmation contained in the last paragraph thereof brought from plaintiff the following:

"Cleveland, Ohio, October 13, 1915.

"The American Shipbuilding Co., Mr. N. S. Thrasher, Pur. Ag't, Cleveland—Gentlemen: This acknowledges your letter of October 12th confirming sale to us of your Lorain and Cleveland accumulation of steel scrap.  Our formal order, per your request, has already gone forward.

"Confirming phone advices of this morning, charging box size, as designated on our formal order, simply means material under 6 feet in length and no plate or other piece wider than 18 inches.

"Again thanking you, we remain, yours very truly,
                                       "The Upson Nut Company,
                                       "H. P. Bingham, Ass't Treasurer."

This was stamped by defendant, "Received Oct. 14, 1915, Purchasing Dept.," but not answered.

Defendant earnestly insists that these letters show an express agreement in writing such as it contends was made; i. e., a sale only of its present accumulation of steel scrap at its Cleveland and Lorain yards, estimated to contain a certain number of tons, and not a sale

of, a fixed tonnage. The oral testimony to be considered in deciding whether or not this contention is sustained consists at most of three telephone conversations between Mr. Thrasher and Mr. Bingham. One of these, between the letter of September 29th and that of October 8th, relates to the modification of the price from $13.62 to $13.75 for the scrap at the Lorain yards. This is the purport of Mr. Bingham's testimony, and is plainly inferable from the October 8th letter. The second telephone conversation was evidently on October 12th, and is referred to in the letter of that date. Neither Mr. Bingham nor Mr. Thrasher gives the details of this conversation. The testimony of Mr. Bingham, presently to be referred to, may, however, relate to this conversation, or to the other referred to in the letter of October 13th, at which time another conversation was had.

Mr. Bingham says the figures, 4,200 tons for the Cleveland yards, and 4,000 tons for the Lorain yards, were fixed for the written contracts signed by the parties as the result of a telephone conversation between him and Mr. Thrasher. Mr. Thrasher gives no specific testimony to the contrary. This is probable, for it will be noted the letter of October 12th places the total tonnage at 8,150 tons, which is 50 tons less than the figures in the letter of October 8th, and also is not divided between the different yards. It is therefore probable that the apportionment was mentioned in a telephone conversation, either the conversation referred to in the letter of October 8th or that of October 12th. The third conversation refers to another telephone conversation, the terms of which no witness gives, but the purport of which is shown in the last paragraph of this last letter.

In my opinion, this oral testimony neither adds to nor takes from the probative effect of these three letters. The telephone conversations appear in each instance to have been immediately confirmed by a letter. The parties did not rely on the telephone conversations as embodying a part of their contract, but reduced the same forthwith to writing by embodying them in these letters. Mr. Bingham's statement that he got the figures, 4,200 tons for the Cleveland yards, and 4,000 tons for the Lorain yards, from Mr. Thrasher in one of these conversations, is consistent with the letters themselves, and does not call for a weighing of conflicting oral testimony.

Let us, therefore, examine these letters. The first letter of September 29th may, in one aspect, be regarded as an offer to sell a fixed tonnage out of the accumulation of steel scrap estimated to be on hand. This aspect ceases to be of importance because it wholly disappears from the proposals actually made and accepted, as embodied in the letters of October 8th, 12th, and 13th. The October 8th letter was evidently carefully prepared, and bears internal evidence that it was designed to express in final form a detailed proposition to be accepted by the defendant. It was prepared after the telephone conversation, and was written for the purpose of confirming that conversation. The offer is "for your present accumulation of steel scrap at your Cleveland plant, which you say approximates 4,200 gross tons" and "for your accumulation of similar material, approximating 4,000

tons, at your Lorain yards." The acceptance thereof in the letter of October 12th is equally definite and certain. The language is:

"We hereby accept your proposition to take from us our present shipyard steel scrap accumulation, * * * estimated at about 8,150 tons."

The last paragraph requests a written confirmation and definite shipping instructions. The October 13th letter acknowledges the October 12th letter, "confirming sale to us of your Lorain and Cleveland accumulation of steel scrap." A more certain and definite agreement could not well be made. No term or condition is left open to be settled. No request or suggestion appears therein that the parties did not expect a final contract to result from the exchange of these letters, or that either party was to embody the contract thus made in a different form and submit it to the other for signature.

Taking these writings, and considering in connection therewith all the oral testimony, no other conclusion is warranted than that a definite agreement was made, and that this agreement was a sale merely of defendant's present accumulation of steel scrap at its Cleveland yards, approximating 4,200 gross tons, and at its Lorain yards approximating 4,000 gross tons. The evidence to sustain this finding is in writing, and does not depend on the slippery memory of interested witnesses, or on conflicting testimony. It is clear and convincing; it is of sufficient cogency to satisfy the mind of the court.

At this juncture Mr. Elliott, plaintiff's bookkeeper, intervenes in the transactions. Mr. Bingham, upon receipt of the October 12th letter, intrusted to this bookkeeper the preparation of the confirmation requested. Mr. Bingham testifies, and no doubt correctly, that he gave to this bookkeeper all the information which was used to fill out this confirmation order, and that he gave him the items of 4,200 tons for the Cleveland yards and 4,000 tons for the Lorain yards. The bookkeeper, in preparing the confirmation, made use of a purchase contract form or order blank used by plaintiff in purchasing material. This form has marginal headings as follows: "Quantity," "Material," "Shipment," "Price, F. O. B.," "Terms," "Remarks." The bookkeeper, in making distribution of the information contained in the letters or received from Mr. Bingham, placed opposite the heading "Quantity" 4,200 gross tons in one form or order, and 4,000 gross tons in the other form or order. He also placed opposite the heading "Shipment" in both forms, "Not to exceed 4 cars per day until completion of contract, from accumulation you have on hand," etc. The bookkeeper does not testify. Mr. Bingham, however, testifies that there was no intention of changing or modifying the terms as made in the letters of October 8th and 12th. His letter of October 13th confirms his testimony in this respect. He insists, however, that the purchase contract forms or orders are the same as those two letters; that they embody the same terms and correctly represent his then understanding of what were the terms and conditions agreed upon.

[4] Obviously this statement of Mr. Bingham is in itself a mistake; his intention or understanding must be for practical purposes infer-

red from the language used by him; he could not have entertained such an understanding, in view of the language used by him in his letter of October 8th, except on the assumption that he did not understand the meaning or the legal effect of the words used. Furthermore, these purchase contract forms, thus filled out, bound the plaintiff to accept shipment at the rate of four cars per day from each yard; whereas, it was expressly agreed that shipment should be made not to exceed a total of four cars per day all told. No one contends that the purchase contract forms in this respect embody the understanding of any one. Mr. Bingham's entire good faith is not questioned; he may have honestly been under the impression that he was to get 8,200 tons, and that the language used by him conveyed that understanding; but such an understanding on his part, in the light of the language used, is not a permissible inference. It is on his part a mistake of law, and, not having been disclosed to the other party, will not be accepted as modifying or qualifying the written terms.

Plaintiff's bookkeeper forwarded the purchase contract forms, thus filled out, duly signed by the plaintiff, on October 12th, prior to the mailing of the letter of October 13th. Mr. Thrasher testifies that he thereupon signed and returned these purchase contract forms, believing that they embodied in substance the true agreement of the parties. He did note the mistake therein that eight cars might be shipped per day, and noted on the copy kept by him, after the words, "Not to exceed four cars per day," the following: "From Cleveland and Lorain together." He also noted, he says, the use of 4,200 tons in one and 4,000 tons in the other, but, observing that shipment was to be made from defendant's accumulation at its different yards, did not discover that the terms of the agreement, as made, were not correctly recorded therein.

[5] I am of opinion that the two purchase form contracts sued on do not correctly embody the contract actually made by the parties. Previous to the bookkeeper's labor of preparing these forms, a definite written agreement had been made. These forms were not prepared for any purpose other than to embody the terms of the agreement already reached. They were prepared and signed only to embody that agreement. Any departure from the terms previously agreed upon was unauthorized and unwarranted. That there was a departure is obvious, and, in my opinion, that departure was the result of an honest mistake or inadvertence on the part of the scrivener, aided, it may be, by Mr. Bingham, in recasting the language and fitting it to the purchase form of contract. If the changes were intentional, and not called to the attention of the other contracting party, the good faith of plaintiff's agents participating therein would be seriously impugned. I am therefore of opinion that all the conditions necessary to warrant a court of equity in reforming a written contract are here present, and that the two contracts sued on should be reformed; so as to express the actual agreement of the parties.

[6] This conclusion, moreover, agrees with the inherent probabilities. The defendant was not a dealer in steel scrap, and this the

plaintiff well knew. This scrap had been accumulated in defendant's shipbuilding operations during a period of several years. It was desirous of getting rid of that accumulation. It is not probable that the defendant would agree to sell that which it did not have on hand, for the reason that similar scrap probably could not be obtained in the market or anywhere. It is equally improbable that it would desire to sell 4,200 tons out of a possible 4,250, leaving a small residue of indefinite amount undisposed of. The probability is that defendant at all times intended to sell a specific accumulation of scrap in a specific place, be it a greater or less amount. Nothing appears to impeach its good faith in representing this estimated amount at the figures contained in the correspondence. It is not to be denied relief because of any error in an estimate thus made in good faith and without any fraud or intentional wrongdoing.

[7] Plaintiff further urges that defendant's negligence or laches should bar the relief sought. This negligence is said to consist in not discovering sooner this mistake in the purchase contract forms and calling it to plaintiff's attention. Plaintiff's injury resulting therefrom is said to be that the price of scrap rose rapidly during the period of shipment, and that when defendant, after shipping its entire accumulation, refused to ship more, it was then too late for the plaintiff to protect itself by purchasing other scrap in the market needed in its business, except at a higher price. This contention is not sound. Negligence or laches cannot on these facts be imputed to the defendant. A similar contention was made and is fully discussed in Griswold v. Hazard, 141 U. S. 260, 286, 287, 11 Sup. Ct. 972, 35 L. Ed. 678. Defendant was under no necessity for acting until plaintiff made some effective effort to establish a liability otherwise than in accordance with the actual terms of the contract between the parties. It had fully performed this contract by shipping and delivering all its then present accumulation of scrap at its Cleveland and Lorain yards. It was not obliged to foresee that plaintiff would wrongfully insist upon a mistake such as is found here to exist; but, as soon as plaintiff's attitude was disclosed by the filing of its petition, defendant's response thereto is made with all due diligence.

A decree will be entered, granting the relief prayed for in defendant's cross-petition.