## NEWPORT NEWS SHIPBUILDING & DRY DOCK CO. v. ISHERWOOD et al.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1925.)

No. 2210.

1. **Reformation of instruments** &#9750;45(2)—**Evidence held to show mutuality of mistake entitling plaintiff to reformation.**

Omission from contract prepared by complainant, through inadvertence of copyist, of material provision which complainant intended to incorporate therein, *held* to entitle complainant to its reformation; evidence being sufficient to sustain burden on complainant of showing that mistake was mutual.

2. **Patents** &#9750;211(1)—**Conduct of licensor held not to violate license agreement.**

Conduct of licensor in returning royalties to corporation building barges under patent without license, under agreement whereby it agreed to recognize patent, *held* not violation of license agreement whereby licensor agreed to give licensee same special concessions, given other shipbuilders for vessels of special design, nor of provision requiring licensor to protect patent from infringement.

3. **Patents** &#9750;211(1)—**Conduct of licensor held not violation of license agreement.'**

Conduct of licensor, in accepting from unlicensed shipbuilder lower rate of royalty for barges constructed under patent, without reducing rate to licensee to same extent, *held* not violation of license agreement.

4. **Patents** &#9750;219(2)—**That licensee furnished invention for use of United States held no defense to suit for royalties.**

Act June 25, 1910, as amended Act July 1, 1918 (Comp. St. Ann. Supp. 1919, § 9465), providing that, wherever patented invention shall be used or manufactured by or for United States without license of owner thereof, or lawful right to use it, owner's remedy shall be by suit against United States in Court of Claims for reasonable compensation, does not apply where invention is furnished for use of United States by licensee under the patent, and is no defense to suit by owner against licensee for royalties on patented devices built for government.

5. **Patents** &#9750;218(5)—**License agreement, giving licensee right to reduction of royalties if other licensees receive lower rates, construed.**

Under license agreement, providing that, if licensor granted licenses to other shipbuilders to construct ships under patent at lower royalties, licensee's royalties should be reduced accordingly, where licenses were granted to other shipbuilders at lower royalties based on higher tonnage measurement, licensee was entitled to reduced rate on such basis of method of measuring tonnage, and not on basis of reduced tonnage measurement provided for in its contract.

6. **Patents** &#9750;218(5) — **Provision of license agreement, giving licensee right to reduction of royalties if other licensees were given lower rates, construed.**

Under license agreement, providing that, if licensor granted licenses to other shipbuilders at lower royalties, rates to licensee would be correspondingly reduced, where licensor granted licenses at lower rates to others, applicable to all ships then under construction, with result that any vessel finished after certain date was settled for on that basis, licensee was entitled to reduced rate on all vessels completed after such date, and not on basis of earliest date on which any ship finished by other licensees under lower rates was begun.

**7. Patents ⬅⇒218(5)—Licensee failing to pay royalties held liable for interest on unpaid installments of royalties.**

Licensee failing to pay royalties for several years, on ships constructed under patent, *held* liable for interest at 6 per cent. on installments of royalty payments as they severally became due.

Woods, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., and D. Lawrence Groner, Judges.

Suit by Joseph W. Isherwood, in his own right and as trustee, and another, against the Newport News Shipbuilding & Dry Dock Company. From a decree for complainant in part (289 F. 282), both parties appeal. Reversed and remanded.

Bill in equity for the reformation of the following contract and for other relief.

"This indenture, made the 1st day of January, 1910, between Joseph William Isherwood, of Zetland Buildings, Middlesbrough, in the county of York (hereinafter called the licensor), of the one part, and Messrs. Newport News Shipbuilding & Dry Dock Company, of Newport News, in the state of Virginia, United States of America (hereinafter called the licensees), of the other part:

"Whereas, by letters patent under the seal of the English Patent Office dated the 2d day of February, 1906, No. 2588, and also in sundry other countries, the sole and exclusive license and authority of making, using, exercising, and vending an invention for 'improvements in the construction of floating vessels' were granted to the licensor; and whereas, the licensor represents that the said invention is protected in the United States of America under serial No. 354,521 under International Convention; and whereas, the licensor has agreed to grant to the licensees such license to use the said invention as is herein contained upon the terms hereinafter appearing: Now this indenture witnesseth, that, in pursuance of the said agreement in consideration of the royalties hereinafter reserved and the covenants on the part of the licensees hereinafter contained, the licensor hereby grants to the licensees full liberty, license, power, and authority to make, use, and exercise the said invention in the construction of merchant vessels and vessels for the government of the United States of America or other countries within their own works at Newport News aforesaid, or within any other works which may during the continuance of this license be occupied by the licensees in the United States of America (Great Lakes excepted), during all the residue now to come and unexpired of the said patents the licensees yielding and paying to the licensor the royalties hereinafter covenanted to be paid, and it is hereby agreed as follows:

"(1) The licensees shall pay to the licensor a royalty at the rate of 5/- per ton gross on vessels of 1,500 tons and upwards. The royalties payable for smaller vessels or naval vessels for foreign governments to be mutually agreed.

"(2) The royalties for each vessel are to be paid by the licensees in three installments —the first, equal to about 25 per cent. of the royalty, when application is made for the plans and after the licensee has entered into contract for the construction of the vessel; the second, equal to about 25 per cent., when the principal plans (midship section, profile and deck plans) are provided and passed by the licensor on behalf of the licensees with the necessary classification society or societies, and after the licensees have entered into contract for the construction of the vessel; the third on completion of the vessel.

"(3) In the case of merchant vessels, the gross tonnage referred to above is the British Board of Trade tonnage measurement, or the equivalent official tonnage of the United States of America. In the event of shelter or hurricane deck ships being built, in which the shelter or hurricane deck is measured in the tonnage, the additional tonnage so obtained is to be exempt from the tonnage on which royalties are chargeable. In the case of war ships to be built, which are not measured for tonnage, the royalties payable to be determined on the fully equipped loaded displacement of each vessel, four-tenths of the fully equipped displacement being considered as the gross tonnage for estimating royalties.

"(4) In the event of any license being granted to any other shipbuilder of the United States of America to build, under this patent system of ship construction, at a less rate than 5/- per gross ton on merchant vessels of 1,500 tons and upwards, the royalties to be paid by the licensees shall be immediately reduced to such rate.

"(5) It is understood that, should the licensor make a special concession in royalties to be paid by other builders in United States of America (Great Lakes excepted) for one or more vessels of special design or size, such exceptional concession will not entitle the licensees to a general reduction in the royalties to be paid by them, but the licensees will also be entitled to at least the

same special concession with respect to vessels of similar design or size which may be built by them, and the licensor will notify the licensees of the reduction at the time the licensor extends to other parties any such reduction, but without giving any information as to the special type of vessel that might be of a confidential nature. The above requirements apply also to vessels under 1,500 tons gross.

"(6) In the event of vessels being built in the United States of America (Great Lakes excepted) by other shipbuilders, under this patent system of ship construction, except by arrangement with the licensor during the continuance of this agreement, the licensor and his successors shall, on being required to do so by the licensees, in writing, and within a reasonable time thereafter, at the licensor's expense, take all such legal action and proceedings as may be necessary to vindicate and protect the said patents, and, in the event of the licensor failing to do so, then the licensees may immediately terminate this agreement, and, after the giving of such notice by the said licensees, the licensees shall be at liberty to proceed with this construction and all claims of the licensor hereunder shall be suspended until the licensor shall have compelled such unauthorized persons to pay royalty or desist from such construction, whereupon payments by the licensees for work done during this time shall be made.

"(7) The licensees will not submit principal scantling plans to other than American classification societies without the approval of the licensor, nor will they make material alteration to such plans without the consent of the licensor, which consent shall not be unreasonably withheld. In the case of scantling plans being submitted direct by the licensees to an American classification society, the licensees agree on receipt of such plans approved by the classification society to forward the licensor copies of such plans, and the licensees agree to carry out any reasonable modifications considered necessary by the licensor, subject to the approval of the classification society.

"(8) The licensees shall have the option, on the signature of this indenture, of agreeing to pay the licensor a minimum annual sum of £300 (three hundred pounds) payable on the 1st of January of each year commencing with the 1st of January, 1910, in which case the royalties to be paid by the licensees to the licensor shall be at the rate of 4/2d per gross ton on merchant vessels of 1,500 tons and upwards, the minimum

annual payments to be averaged over the life of the patents, and to be credited in statement of account against royalties as they become due.

"(9) Should the licensees declare this option, the licensor agrees that, in the event of a license or licenses being granted at a less rate than 5/– per gross ton for merchant vessels of 1,500 tons and upwards to other builders in the United States of America (Great Lakes excepted), in which the obligation to maintain a minimum annual payment of not less than £300 is not included then the licensees royalties of 4/2d per gross ton are to be reduced pro rata, or, if preferred by the licensees and if declared within 28 days of receipt of advice from the licensor as to the granting of such license or licenses, their obligation to maintain a minimum annual payment shall cease, and their rates shall be not less favorable than those referred to in the license or licenses aforesaid.

"(10) Should the licensor form a company, whether limited or otherwise, to own and work the patents, the licensees will not object to this indenture being taken over and carried out by such company.

"In witness whereof the said Joseph William Isherwood has hereunto set his hand, and the said Newport News Shipbuilding & Dry Dock Company have hereunto set their hands.

"Signed by the said Joseph William Isherwood:      J. W. Isherwood.
"In the presence of
    "W. Tennant, Clerk,
        "Zetland Buildings, Middlesbro.
"Signed by the said Newport News Shipbuilding & Dry Dock Company.
        "W. A. Post, General Manager.
"In the presence of
    "L. F. Boggs."

G. S. Ferguson, Jr., of Greensboro, N. C., and F. H. Skinner, of Newport News, Va. (R. G. Bickford, of Newport News, Va., on the brief) for appellant and cross-appellee.

C. V. Meredith, of Richmond, Va., and F. P. Fish, of Boston, Mass. (Hubert Howson and Charles H. Howson, both of New York City, on the brief), for appellees and cross-appellants.

Before WOODS, and ROSE, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge (after stating the facts as above). Joseph W. Isherwood, an English naval architect, is the inventor of a new method of ship construction. It in-

volves the use of transverse frames having a depth and spacing substantially the same or greater than the large transverse frames of the web frame system, formerly in vogue, and substitutes for the intermediate framing of that system a multiplicity of relatively small and closely spaced longitudinal frames. Amongst other advantages claimed for the invention is a saving of metal in the construction of the ship, without impairment of the strength or stiffness of the vessel. Isherwood was granted a patent in England in 1906, and in the United States in 1912. His system has been adopted quite widely, and many shipbuilders, both in this country and abroad, have employed it as licensees under his patents. When the story of this case begins, the American patent was still pending under an application previously made.

The controversy in the case arises out of transactions between Isherwood and others, as owners of the American patent and the Newport News Shipbuilding & Dry Dock Company, hereinafter called defendant, one of the licensees. The owners filed a bill of complaint in November, 1914, against the Newport News Company in the Eastern District of Virginia, praying for the reformation of the license contract dated January 1, 1910, and also praying for an injunction against the construction by the defendant of vessels under the contract, without first submitting to the complainants plans thereof, and for an accounting and payment of royalties on vessels constructed by the defendant under the license. The answer of the defendant admits the execution of the contract, but denies that the complainants are entitled to reformation or to the amount of royalties claimed. The decree of the District Court refused reformation, granted an injunction, and fixed the sum payable by defendant as $204,400.02, with interest on $169,885.02 from July 1, 1923. Both parties appealed.

The right of the complainants to reformation of the contract is the most important issue in the case. It is sought to correct clause 4 of the contract, which is as follows:

"(4) In the event of any license being granted to any other shipbuilder of the United States of America to build under this patent system of ship construction, at a less rate than 5/– per gross ton on merchant vessels of 1,500 tons and upwards, the royalties to be paid by the licensees shall be immediately reduced to such rate"—by inserting the words "(Great Lakes excepted)" after the words "United States of America."

The contract, though dated January 1, 1910, was executed on or about April 8, 1910. Both before and after these dates, Isherwood was in negotiation with the Pittsburg Steamship Company and the American Shipbuilding Company, both of which had offices at Cleveland, Ohio, and were engaged in business on the Great Lakes. In the year 1910, after the execution of the contract with the defendant, Isherwood contracted with the American Shipbuilding Company for the use of his system on the Great Lakes, on the royalty basis of 3 shillings per ton, and also authorized the use of the system in the construction of ships for the Pittsburg Steamship Company on the Great Lakes at the rate of two shillings six pence per ton.

These licenses did not come to the attention of the defendant until May, 1913. For a period of more than two years prior to this date, Isherwood had been unable to collect royalties from the defendant, although the latter was making use of the system in the construction of ships. It made payment to Isherwood of the royalties, on the first ship completed by it on or about August 6, 1910, but thereafter, although continuing to make use of the system, it refused to make payment of royalties, and, on one ground or another, contested its liability under the contract. When it discovered the Great Lakes licenses referred to, it set up the additional defense that it was entitled to royalties at the figures charged in these contracts. Then for the first time Isherwood discovered that he had failed to except the Great Lakes from clause 4 of the defendant's contract, and on his part made the claim that the omission was a mistake mutual to both parties. This mistake the defendant denies.

The law applicable to the reformation of contracts is thus stated in Bailey v. Lisle Mfg. Co., 238 F. 257, 266, 152 C. C. A. 3, 12;

"The jurisdiction of a court of equity to reform a written contract for mutual mistake, or for mistake on one side and fraud, deceit, or inequitable conduct on the other, is indisputable. But the purpose of a written contract is to furnish a record of the terms of the agreement of the parties not easily impeached, and thereby to avoid subsequent disputes and conflicting testimony and claims regarding its terms and their meaning. To accomplish this purpose, and to prevent such disputes from annulling written agreements, two rules have been firmly established in equity: First, that the burden is on the complainant to prove the mutual mistake, or the mistake of one party and

the deceit, fraud, or inequitable conduct of the other, upon which he relies for a modification or avoidance of the contract; and, second, that, in view of the written record of the terms of the agreement made at the time a preponderance of the evidence is insufficient, and nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement. Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 435, 12 Sup. Ct. 239, 35 L. Ed. 1063; Thallmann v. Thomas, 111 Fed. 277, 283, 49 C. C. A. 317, 323; Hearne v. Marine Ins. Co., 87 U. S. 488, 490, 22 L. Ed. 395; Maxwell Land Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Biser v. Bauer, 205 Fed. 229, 232, 123 C. C. A. 417, 420."

Williston on Contracts, § 1597, states:

"Though it is settled that there must be more than a mere preponderance of evidence in order to justify relief in equity from mistake in a written instrument, the language of different courts varies in regard to the quantum of evidence necessary to sustain the burden of proof thrown upon one who seeks relief. In many cases it is said that proof must be beyond a reasonable doubt, but this mode of expression has been criticized, and the better and commoner way of appraising the quantum of proof is to state that the evidence must be clear and satisfactory or words of similar effect." See Campbell v. Northwest Eckington Imp. Co., 229 U. S. 561, 33 S. Ct. 796, 57 L. Ed. 1330; Philippine Sugar Est., etc., Co. v. Philippine Islands, 247 U. S. 385, 38 S. Ct. 513, 62 L. Ed. 1177; Upson Nut. Co. v. American Shipbuilding Co. (D. C.) 251 F. 707.

[1] After careful consideration of the evidence, including the testimony of Isherwood and his clerk, who appeared as witnesses in court, the District Judge reached the conclusion that Isherwood in fact intended to except the Great Lakes from clause 4 of the contract, but by a mistake failed to do so. Isherwood produced a draft of the contract prepared by the defendant which he used in making the final draft executed by the parties. In this document the words "Great Lakes excepted" were interlined in his own handwriting in clause 4. His clerk, when making the final copy, in some inexplicable way omitted them. The other provisions of the contract, as will hereafter appear, Isherwood's negotiations with the Great Lakes shipbuilders, his contracts with other shipbuilders, and the circumstances of the case generally, support the conclusions of the

District Judge, and, without discussion of the testimony, we think it necessary only to say that we fully concur in his conclusion.

It is necessary, however, to determine whether the mistake was shared by the defendant company. No oral testimony was offered on its behalf in this respect for the reason, as it explained, that all of the officers of the company who participated in the negotiations, were deceased at the time of trial. When the negotiations took place, Isherwood was in England, so that the matter must be decided entirely upon the correspondence between the parties in connection with the various drafts of the contract which passed between them.

On December 31, 1909, Isherwood wrote to the defendant company, inclosing a draft of a contract of license, wherein he granted to the company full authority to make use of the invention in the construction of merchant vessels at Newport News, and at any other works occupied by the defendant company in the United States, during the life of the patent, upon payment of the royalty of 5 shillings per gross ton on vessels from 1,500 tons and upward; the royalties payable for smaller vessels to be mutually agreed upon. In section 5 of the contract it was provided that, in the event of any license being granted to any other shipbuilder on the east coast of the United States at a less rate than 5 shillings per gross ton, the royalties to be paid by the defendant should be correspondingly reduced.

On January 21, 1910, the defendant company wrote to Isherwood that there were some features in the license contract which did not protect its interest with respect to competition with other shipbuilders in the United States, and inclosed a new draft of the proposed contract, and set out, in its letter, in paragraphs numbered so as to correspond with the sections of the original draft, the reasons for the changes. The most important change was in section 5, which was altered so as to read as follows (section 5 becoming section 4 in the new draft):

"(4) In the event of any license being granted to any other shipbuilder of the United States of America, to build under this patent system of ship construction at a less rate than 5 shillings per ton gross, the royalties to be paid by the licensee shall be immediately reduced to such rate."

Commenting on this change, and using the number of the section in the original draft, defendant said:

"Section 5. We invite your attention to the fact that we are liable to be in competi-

tion with other shipbuilders of the United States besides those on the east coast."

The contract, in the form thus submitted by the defendant, was not satisfactory to Isherwood, who amended the granting clause, so that, instead of granting the defendant a license to use the system anywhere in the United States, the Great Lakes were excepted, and in three other sections of the contract, hereinafter referred to, similar exceptions were made of the Great Lakes. He, however, accepted clause 4 of the contract as proposed by the defendant, except that he limited the effect thereof by excluding vessels under 1,500 tons. This amendment was made in order to bring the clause in line with section 1 of the contract, which fixed the royalty at 5 shillings per ton on vessels of 1,500 tons and upwards, reserving the royalties for smaller vessels for future agreements.

But Isherwood neglected to except the Great Lakes specifically from section 4 of his new draft. In his accompanying letter of March 23, 1910, however, he said (using, as the defendant had done, the number of the section as it appeared in his original draft):

"Section 5. I must retain an entirely free hand in regard to the Great Lakes, as I may dispose of the rights for the Great Lakes; otherwise I agree to your suggestion."

Bearing in mind that in Isherwood's first draft the equality clause had been limited to the east coast of the United States, that in the defendant's draft the clause was made applicable to the whole United States on the ground that the defendant was entitled to protection from competition, and that in response Isherwood used in his letter the language above quoted, it would seem that any one reading the correspondence must perceive that Isherwood was not willing to accord equality to the defendant so far as the Great Lakes were concerned, but that otherwise the defendant would be placed on the same footing as other shipbuilders in the United States. He stated in effect that he must be free to make arrangements on the Great Lakes in regard to his patent system, irrespective of his contract with the defendant. He gave as a reason that he might dispose of the rights for the Great Lakes. Obviously he might do this either by a sale and assignment of his rights as an entirety, or by granting licenses to shipbuilders in that section. In either case there was a possibility that shipbuilders on the Great Lakes might be authorized to use the system at lower rates than 5 shillings per ton. It was

of course quite possible for Isherwood to protect the defendant in either case. He could agree that, if he granted licenses at less than 5 shillings per ton, the defendant should have a corresponding reduction, and that, if he made a sale and assignment of his entire rights, he would accord to the defendant such lower rates as might be specified in licenses granted by the assignee. But it is quite clear from the comment in his letter that he did not intend to protect the defendant from such lower rates as might follow from his disposition of the Great Lakes rights, whatever form that disposition took. To hold otherwise is to give no weight to his answer to the request of the defendant for equality of treatment with shipbuilders throughout the United States, wherein he said in effect: "I must retain a free hand as to the Great Lakes, but otherwise I agree to your suggestion."

So much as has been said in regard to the construction to be placed upon Isherwood's language is based upon the assumption that it was clear from the papers that in Isherwood's letter of March 23 his comment as to a free hand upon the Great Lakes was directed specifically to section 4 of the final draft. The defendant on its part contends that, while this may be a reasonable interpretation, it is not the only one, but that, for aught that the defendant knew, Isherwood's reference to the Great Lakes and a free hand in the disposition of his license rights thereon related to those portions of the contract in which the Great Lakes were specifically mentioned. Attention is called to the fact that this is the only mention in Isherwood's letter of his exception of the Great Lakes from the contract, and that the defendant could reasonably have supposed that he was talking in his letter about those paragraphs of the contract in which the Great Lakes were mentioned, and not to section 4, in which no mention of the Great Lakes was made. If the papers be reasonably open to this interpretation, the plaintiffs' case must fall, since the burden of clear convincing proof would not be met.

It must be conceded that the papers on their face bear unmistakable evidence that Isherwood had exercised very considerable care in the preparation of the final draft. It contained ten paragraphs, only two of which (paragraphs 1 and 2) were precisely the same as the corresponding paragraphs in the defendant's draft. The granting clause and sections 3, 4, 5, and 6 were changed, and sections 7, 8, 9, and 10 were added. Moreover, the words "Great Lakes excepted"

were inserted by Isherwood in the granting clause, and in sections 5, 6, and 9. In section 6 these words were interlined in Isherwood's own handwriting, and authenticated by his initials in the margin. Section 4 of the contract under controversy was itself amended so that the words "tons gross" were made to read "gross tons," and the words "on merchant vessels of 1,500 tons and upwards" were inserted. The defendant says, therefore, that it had the right to suppose that Isherwood, having made so many changes with special reference to the Great Lakes, and having obviously given his personal attention to the matter, had made all the changes he had in mind. If in fact he intended to except the "Great Lakes" from clause 4, there was no reason for the defendant to suspect a mistake.

In the original draft of Isherwood, and in the defendant's draft, the defendant was granted full license to use the invention in its works at Newport News or in any other works occupied by it in the United States. In the final draft, the Great Lakes were excepted from the granting clause, and thereby, when the contract was signed, the defendant was excluded from operating on the Great Lakes. It is true that the defendant had no plant on the Great Lakes, and, so far as the evidence discloses, no intention of building ships at that place. Nevertheless the defendant says that the free hand which Isherwood desired to retain in regard to the Great Lakes was secured to him by withholding from it the privilege of there using the patent rights. On this theory, the granting clause and section 4 of the contract may be read in harmony with the letter of March 23, 1910, and each of these documents is given a reasonable meaning. Isherwood could sell or dispose of his rights on the Great Lakes without reference to the defendant, and at the same time guarantee to the defendant, by section 4, that, if lower rates or royalties were given to Great Lakes shipbuilders, the defendant should have like treatment.

This argument proceeds upon the theory that Isherwood's comment in his letter did not relate to clause 5 (then 4) which it specifically mentioned, but referred to the granting clause from which the Great Lakes were expressly excepted. But the Great Lakes were likewise excepted from clauses 5, 6, and 9, and these clauses must be examined in order to ascertain if they are in harmony with defendant's theory. Section 5 relates to vessels of special design, as to which the licensor is permitted to make a special concession in royalties without entitling the defendant

company to a general reduction in the royalties to be paid by it; the defendant in such case to be entitled only to the same special concession. From the operation of this clause Isherwood excepted the Great Lakes. It is quite impossible to harmonize this clause with the defendant's theory. If the reservation designed by Isherwood was merely territorial, and the granting of licenses on the Great Lakes by Isherwood or by his assignees at reduced rates was to involve a corresponding reduction in the defendant's rates generally, there was no reason to except the Great Lakes in regard to special concessions covered by clause 5.

Section 6 of the contract requires Isherwood to take proceedings to vindicate the patent rights in the event of vessels being built in the United States under the patent system, without license, and from this clause the Great Lakes are excepted. Here again it is difficult to harmonize the clause with defendant's theory. One might well understand that Isherwood, if he sold the patent rights for the Great Lakes, would not desire to retain the obligation to prosecute infringers; but, if defendant believed that Isherwood had obligated himself to give it equal rates, not only with his licensees, but also with the licensees of his assignees on the Great Lakes, it would naturally expect Isherwood to prevent the use of his system on the Great Lakes by persons who paid no royalties whatever.

Finally, the Great Lakes are again mentioned in section 9 of the contract. This relates to an option extended by Isherwood to the defendant in section 8 under which, if accepted, a minimum annual sum of 300 pounds would be paid by the defendant, and royalties would be paid at the rate of 4 shillings 2 pence per ton instead of 5 shillings. Section 9 provides that, if the defendant should avail itself of this option, and licenses should be granted at less than 5 shillings per ton to other builders who were not under an obligation to maintain a minimum annual payment of 300 pounds, then the defendant's rate of 4 shillings 2 pence should be reduced pro rata; but from the operation of this clause the Great Lakes are excepted. No reasonable explanation appears by which this clause can be harmonized with the defendant's theory. If the defendant should have availed itself of the option, there was every reason why it should wish a reduction in rates if one should be accorded elsewhere. If the defendant understood that the reduction of rates on the Great Lakes would operate under clause 4 to bring about a reduc-

tion in its own rates, it would discover in the correspondence or the contract no' reason for the exception of the Great Lakes, if it should choose to operate on the minimum annual payment basis. The question would have inevitably arisen as to why Isherwood was willing to give it equality with operators on the Great Lakes, as to the royalty basis of 5 shillings per ton, but was not willing to give it equality of royalties on the basis of minimum annual payments.

The option covered by clauses 8 and 9 was regarded by the defendant as an important part of the contract. On May 3, 1910, the month after the contract was signed, the defendant wrote to Isherwood that it was investigating the possible advantage of selecting the option offered, and requested a copy of the American patent and information as to when it would issue. Again in July the defendant wrote that it was still considering the option, but, since American shipbuilders had not had time to appreciate the advantages of the system, Isherwood was requested to leave the option open until the fall. This Isherwood consented to do. Again in January, 1911, the defendant referring to the fact that it had no advices that the American patent had been issued, stated that, if the patent had been issued, it would like to give consideration to the matter of option, in response to which Isherwood agreed that the option might remain open until such time as the patent should be issued. It is obvious that the defendant gave careful consideration to clauses 8 and 9 of the contract, and that the fact that the Great Lakes were excepted in clause 9 did not seem to the defendant to be a matter of any importance. The significance of this point is realized by an illustration. If defendant had declared the option, it would not have been entitled, even upon its own theory, to the reduced royalty rate of 2 shillings 6 pence per ton granted the Pittsburg Steamship Company, because in the latter's contract there was no provision for a minimum annual payment.

Careful consideration of the several forms of the contract proposed, and the correspondence between the parties, leads us to the conclusion that Isherwood's mistake must have been obvious to the officers of the defendant who executed the final draft. If they believed, when they read Isherwood's letter of March 23, 1910, that his reservation of a free hand upon the Great Lakes related to section 4 of the contract, as the numbered paragraphs of his letter naturally indicated, the mistake was obvious. If, upon the first reading of the letter, they were in doubt upon this fact, and supposed that the reference to the Great Lakes referred to the granting clause and sections 5, 6, and 9 of the contract, they would have perceived at once, upon an examination of these clauses, taken together, that this supposition was untenable. Indeed clauses 5 and 9 relate to the same subject as clause 4, to wit, the amount of royalties to be paid by the defendant, with reductions to correspond to the rates subsequently granted to other shipbuilders. They are entirely out of place in the contract, if, as the defendant contends, the main purpose was to deprive the defendant of the right of using the system on the Great Lakes, but at the same time to accord to it the same basis of royalties there enjoyed.

The defendant's letter of January 21, 1910, clearly shows that it insisted upon protection from competition, and it contends that this must have been understood to include competition between shipbuilders on the coast and shipbuilders on the Great Lakes. But there is litle evidence to support the claim. Isherwood and other witnesses experienced in the business of shipbuilding testified that shipbuilders on the coast did not consider the Great Lakes shipbuilders as competitors, and that in fact there was no substantial competition between the two sections. The defendant produced no witnesses to deny this testimony, satisfying itself by showing that between the years 1900 and 1910, a number of vessels built upon the Great Lakes were transferred to the coast through the Welland Canal. The size of the canal is such as to limit the tonnage of vessels to approximately 2,600 tons. Of vessels 2,600 tons and under there were 12 vessels built on the Great Lakes for use on the coast during the period mentioned, and during the same period, there were 36 vessels, having an aggregate gross tonnage of 72,564 tons, which were transferred from the Great Lakes to the coast. It is true that during this period the defendant company was engaged in building a number of smaller vessels of a size which could be built upon the Lakes, and transferred to the coast, but there is nothing in the testimony to indicate that, from the standpoint of competition, it was a matter of importance to the defendant that builders on the Great Lakes might enjoy a smaller royalty than builders on the Atlantic Coast. In fact, other shipbuilders of substantial size entered into contracts with Isherwood in which the equality clause was found, from the operation of which the Great Lakes were excepted. If defendant feared competition from that quarter, it would not have accept-

ed clause 9 of its contract from which the Great Lakes were expressly excepted.

The actions of the defendant company, after the execution of the license contract with Isherwood in April, 1910, throw considerable light upon the bona fides of its defense. The first ship which it built under Isherwood's system was completed in August, 1910, and settlement of royalties was made on the basis of 5 shillings per ton. Thereafter until 1921, the defendant continued to build ships under the Isherwood system, amounting in all to 33 ships, but has failed to make any payment whatsoever to the plaintiff. The discovery of the smaller royalty payments by shipbuilders on the Great Lakes in May 1913, furnishes some reason for the lack of payments after that date, since the defendant thereupon determined to stand upon the letter of the contract and denied that there was any mistake in it; but no reasonable explanation has been offered for the failure of the defendant to pay royalties while building ships under the system between August, 1910, and May, 1913. The correspondence shows that as early as May 12, 1911, the defendant began to find fault with the contract which it had signed. It then referred to the delay in the issuance of the United States patent, and spoke of a current report that no valid patent could be issued. In July, 1911, it announced to the plaintiffs that, because of the delay and the prevalent doubt of the validity of the patent, it would not be unreasonable if the payments should be suspended until the issuance of the patent. In October, 1911, it gave formal notice to Isherwood that an unnamed shipbuilder was building ships under the system on the east coast, without authority from Isherwood, and demanded that, in accordance with section 6 of the contract, Isherwood take legal steps to vindicate and protect his patent rights; but, on request for the name of the infringer from Isherwood, it vouchsafed no information. On June 1, 1912, the American patent was issued, and in the following month Isherwood demanded payment of the royalties in arrear, then amounting to 2,615 pounds. Still the defendant refused to make payment, and thereafter, until March 21, 1913, it declared in various letters to Isherwood that it was conducting certain investigations, through counsel, and would not make payment until it received a final report.

It was during the negotiations between counsel for the parties in May, 1913, that the Great Lakes contracts were first discussed between the parties, and thereafter the defendant added this defense to payment of the plaintiff's bills. It continued to make use of the Isherwood system as a licensee. It claimed the right to make payment on the basis of the Great Lakes contracts. So much was consistent with its interpretation of its contract, but at the same time, through its counsel, it continued to question the validity of the contract, submitted numerous questions to be answered by the patentees with reference to the novelty and character of the invention, and took the position that, unless it was satisfied as to the validity of the patent, it would make no payment of royalties. This contention was manifestly dilatory and without excuse, since defendant was then acting under a license from Isherwood, and was thereby estopped from denying the validity of the patent. Indeed one cannot read the correspondence between the parties during the years 1911, 1912, and 1913, without arriving at the conclusion that the defendant was diligently endeavoring to find some means by which it might avoid its contractual obligations.

It is unfortunate that all of the officers of the company, who were in negotiation with Isherwood at the time of the execution of the contract in April, 1910, were deceased at the time of trial, and that the defendant was deprived of their testimony. It nevertheless insists that the affidavit to its answer, made by Mr. Hopkins, the president of the company, who has since died, is an indication that, had the witnesses been available, they would have been able to show that the contract was not entered into through mistake. But the attorney for the company, who conducted most of the negotiations on behalf of the defendant, and was its adviser when it entered into the contract in April, 1910, was available at the time of the trial. He was not offered as a witness upon the stand.

For these reasons, we are of the opinion that the complainants have met the burden of proof and are entitled to the reformation of the contract as prayed.

[2] The defendant further claims that it is freed from the obligations of the contract altogether, because the evidence shows that the plaintiff on its part broke the contract. This contention is based on the construction for the Standard Oil Company of certain barges under the Isherwood system in the spring of 1910. They were built by the Staten Island Shipbuilding Company, who held no license from Isherwood. The latter knew of this infringement of his patent claim, and endeavored to make collection from the shipbuilder or the Standard Oil

Company. Both companies declined to make payment and attempted on various grounds to excuse the infringement of the patent, which at that time had not been granted. Negotiations ensued, which finally resulted in the recognition of the patent by the shipbuilders by the payment of royalties at the 5 shilling rate to Isherwood, who in turn paid the amount so received, approximately $1,000, to an executive officer of the Standard Oil Company which he, in turn, with the consent of Isherwood, paid to the Staten Island Company. The construction of the barges began before the execution of the contract with the defendant, and was completed on or about that date. In May 1911, Isherwood informed the defendant company that the royalties on these barges had been paid, which, to say the least, was a disingenuous statement.

By this conduct, the defendant says that Isherwood violated sections 5 and 6 of the contract. Section 5 refers to a special concession of royalties for vessels of special design, which may be made by Isherwood without a general reduction in royalties, but entitles the defendant company to the same special concession. The clause requires Isherwood to notify the defendant of a reduction. It is clear that section 5 does not apply to the Staten Island matter. The barges were not of special design, and they were less than 1,500 tons, and consequently were not covered by the terms of the contract. The final sentence of section 5, which makes its provisions applicable to vessels under 1,500 tons gross, evidently applies to vessels of special design. Nor does this conduct amount to a breach of section 6 of the contract requiring Isherwood, upon notice from the defendant, to vindicate and protect the patent from infringement. The patent had not been issued. The amount involved was small, and the arrangement made was probably the best that could be had under the circumstances. It amounted to a recognition of the patent on the part of the infringing shipbuilders, and certainly did the defendant no harm.

[3] The defendant also claims that Isherwood violated his contract in connection with the construction in 1912–13, by the American Bridge Company and John H. Dialogue & Son, of 6 small barges for the Texas Steamship Company, of the aggregate gross tonnage of 2,598 tons. Neither the Steamship Company nor the builders had a license from Isherwood to employ the system. In October, 1914, Isherwood, in conference with counsel for the defendant, stated that these companies had built the barges for a little less than 5 shillings per ton, and that the royalties were paid by arrangement with the owners. The facts were that the barges were not built under license, Isherwood did not have any general arrangement with the Texas Company, and the rate of royalty, which was determined and paid after the barges were completed, amounted to 3 shillings 4 pence per ton. It is quite apparent that there is no merit in this defense. The barges were not of special design. The defendant company had no license from Isherwood to construct vessels under 1,500 tons under the Isherwood system, and the equality clause gave the defendant no right of reduction in royalties in case Isherwood granted licenses at less than 5 shillings a ton for the construction of vessels of less than 1,500 tons.

[4] In the next place the defendant claims that it is not required to pay royalties on 8 ships constructed by it under the system for the United States. On October 10, 1918, the defendant company entered into a contract with the Secretary of the Navy to build for the United States 8 oil tank vessels under the Isherwood system. The contract provided that the vessels were the property of the United States, and were constructed on the order of the United States, and that the Department would assume all costs, expenses, royalties, and damages for infringement of patents, or the use of patented inventions in the construction of the vessels. The defendant contends that, in view of Act June 25, 1910 (36 Stat. 851), as amended by Act July 1, 1918 (40 Stat. 705 [Comp. St. Ann. Supp. 1919, § 9465]), these vessels were not constructed under the Isherwood license, and that therefore Isherwood's sole remedy is by suit in the Court of Claims against the United States for recovery of compensation. The material parts of the statutes are as follows:

Act June 25, 1910 (Comp. St. § 9465): "Whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims."

Act July 1, 1918: "Whenever an invention described in and covered by a patent of the United States shall hereafter be used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, such owner's remedy shall be by suit against the United States in the Court of Claims

for the recovery of his reasonable and entire compensation for such use and manufacture."

It is only necessary to read the statutes to determine that they have no application to the case at bar. There was no use of a patent by the United States, without license of the owner. On the contrary, the vessels were built for the United States by the defendant under a lawful contract for the use of the patent.

[5] Two other matters relating to the basis for the calculation of royalties as determined by the decree of the District Court must now be noticed. In 1916 a number of shipbuilders were operating in this country under license from the plaintiff. Aside from the American Shipbuilding Company and the Pittsburg Steamship Company on the Great Lakes, all of the licenses were on the basis of 5 shillings per ton, as in the case of the contract with the defendant, with the exception, however, of three contracts in which a minimum annual payment of 300 pounds was guaranteed and the royalty basis was 4 shillings 2 pence per ton. On or about June 28, 1916, these contracts were amended by supplemental agreements, whereby, in lieu of the royalties theretofore agreed upon, the licensees agreed to pay "royalties at the rate of 3 shillings per actual gross registered ton (United States of America official measurement) on vessels now in process of construction, and on such vessels of 1,500 tons and upwards as may be hereafter built by the licensee according to the Isherwood system." By this action, the defendant company became entitled, under section 4 of its contract, to a like reduction, and accordingly, in October, 1916, the same rates were offered to it.

It is admitted by both parties that the rate of 3 shillings should be applied, but it is claimed by the defendant that the tonnage should not be computed in accordance with the new contracts signed by Isherwood in June, 1916, but should be measured in accordance with the provisions of section 3 of the defendant's contract. This provides that, in the case of shelter deck vessels, in which the shelter deck is measured in the tonnage, the additional tonnage so obtained is to be exempt from royalty. The point is that the tonnage as measured by the new contracts of June 28, 1916, is higher than the tonnage measured in accordance with section 3 of the defendant's contract. The defendant's claim is that it is entitled to enjoy the reduced rate of 3 shillings in the 1916 contracts whilst preserving the reduced measurement of tonnage, as provided in its 1910 contract. In this respect we think the defendant's claim is unfounded. The spirit of the defendant's contract is that, with the exception of the Great Lakes, the royalties paid by the defendant should be the same as those paid by the other shipbuilders in the United States. This result will be reached by according to the defendant the same treatment as that given to other shipbuilders, but no better treatment. If the defendant is permitted to operate on the basis of 3 shillings per ton, and at the same time to measure its tonnage at a smaller amount than other shipbuilders, the effect will be that it will receive a lower rate than its competitor. This was not contemplated by the contract.

[6] In respect to the same contracts of 1916, the defendant further claims that the District Court erred in ascertaining the vessels of the defendant to which it should be applicable. By the provisions of these contracts, the 3-shilling rate was made applicable to all vessels then under construction, with the result that any vessels finished after June 28, 1916, were settled for on the royalty basis of 3 shillings. The defendant claims that it is not only entitled to this treatment, but that it was the duty of the District Court to ascertain the earliest date upon which any ship finished by any Isherwood licensee after June 28, 1916, was begun, and that the reduction of defendant's royalty from 5 shillings to 3 shillings should be applied from this earliest date. This contention is based upon section 4 of the defendant's contract, which provides that, in the event of any license being granted to any other shipbuilder at a less rate than 5 shillings per ton, the royalties to be paid by the defendant should be immediately reduced to such rate. But it is manifest that, if defendant's royalties are reduced to 3 shillings on all vessels completed by it after June 28, 1916, it is placed on precisely the same basis as other shipbuilders, which is all it has a right to claim under the contract.

(A) It follows that the rate of royalty payable by the defendant should be 5 shillings per gross ton on vessels completed prior to June 28, 1916, and 3 shillings per gross ton on vessels completed since June 28, 1916.

[7] There remains only the question of interest. In view of the defendant's failure to make payment of royalties since 1910, and the construction by it in the meantime of 33 ships under the Isherwood system, we see no reason why it should not pay interest on the moneys it has withheld from the complainants. The defendant should be charged

in the final decree with interest at 6 per cent. per annum on the installments of royalty payments as they severally became due on each of the 33 ships constructed by it upon which no royalties have been paid.

We are in accord with the findings of the District Judge in this case, except in the matters of reformation of the contract and of interest. The decree is therefore reversed, and the cause remanded for further proceedings, in order to ascertain the amount of royalties, with interest, due the complainants in accordance with this opinion, and for a final decree in conformity therewith.

Reversed.

WOODS, Circuit Judge (dissenting). I am unable to agree that the evidence warrants reformation of the license contract.