# Richmond.

WARNER MOORE & Co. v. WESTERN ASSURANCE Co.

January 12, 1905.

1. INSURANCE—*Reformation and Enforcement of Policy—Mistake.*—A court of equity will reform and enforce a contract of insurance, after loss, in case of a plain mistake, clearly made out by satisfactory and unquestionable proof. In the case in judgment, a mutual mistake was plainly made in describing the location of the property insured, and it is established by the requisite proof.

Appeal from a decree pronounced by the Chancery Court of the city of Richmond in a suit in chancery, wherein the appellants were the complainants, and the appellee was the defendant.

*Reversed.*

The opinion states the case.

*Shelton & Moore,* for the appellants.

*Wm. Ellyson* and *A. L. Holladay,* for the appellee.

CARDWELL, J., delivered the opinion of the court.

This appeal is from a decree of the Chancery Court of the city of Richmond, denying the relief sought in a bill filed by appellants against appellee, to reform and enforce a certain

fire insurance policy, issued on the 15th day of December, 1901, by appellee, through its agents, Julius Straus & Son, to appellants, insuring to the amount of $1,000 certain personal property mentioned and described in the policy, so that the policy would carry out and conform, and be paid according to, the true contract and intention of appellants and their agents, J. B. Moore & Co., on the one part, and the appellee and its agents aforesaid on the other part; it being alleged that at the time of the execution of the policy a mutual mistake was made in describing the building in which the property insured was situated.

It appears that appellants owned considerable property in the city of Richmond, both real and personal, requiring them to take out a large amount of insurance, for protection against fire, from time to time. Among those owned by them are three buildings adjoining each other, situated on the south side of Richmond dock, near the foot of Seventeenth street, and running back towards James river. These buildings are generally described as the "easternmost," the "middle," and the "westernmost." Each of the buildings has a separate insurance rating, both upon itself and stock contained in it, and has each its own peculiar and different description, all insurance policies using practically the same descriptive language.

It appears that appellants had a policy of insurance on the "easternmost" or corner building, as we shall call it in this opinion, with the Virginia Fire & Marine Insurance Company, for $1,000, and a like policy issued by the same company upon the contents of the building, each to expire on the 15th day of December, 1901, which policies the Virginia Fire & Marine Insurance Company refused to renew; whereupon appellants, through J. B. Moore & Co., their agents, applied to Julius Straus & Son, insurance agents, of the city of Richmond, on the 13th day of December, 1901, for policies of insurance to

take the place of those which the Virginia Fire & Marine Insurance Company declined to renew, the one being, as above stated, for $1,000 on the corner building at the foot of Seventeenth street, and the other on the contents of that building. Upon this application being made, Milton J. Straus, one of the firm of Julius Straus & Son, called at the office of J. B. Moore & Co. and inquired whether the insurance applied for was intended to cover the old sumac mill or warehouse—that is, the "middle" building—stating that if so the Western Assurance Company (appellee) would not furnish the insurance as it had already declined to do so, and upon being informed by J. B. Moore & Co. that it was not the "middle" building wherein the sumac mill had formerly run, but the corner building, Straus took the typewritten "slips," which had been left with his firm when application for insurance was made, back to his office and issued the two policies hereinbefore mentioned, the one on the corner building and the other on personal property, but in the policy here in question, No. 1,864,265, the policy on the personalty, the same is described as being located in "a brick *and iron* building," &c., which description applied only to the "middle" building, spoken of also in the record as the sumac mill or warehouse. The typewritten "slips" spoken of were made out by J. B. Moore & Co.'s clerk, and left at the office of Julius Straus & Son by him, and in these "slips" the error was begun in describing the location of the personal property, that is, the stock intended to be insured.

Upon issuing the policy upon the stock, &c., Straus made an entry on an insurance map which he kept in his office to the effect that the property insured was located in the "middle" or sumac warehouse building.

On December 31, 1901, the corner building was burned, as was also the stock therein, and appellee's agents, Straus & Son, reported both losses to appellee, and the insurance on the

building was promptly paid, but payment of the insurance on the stock was denied, upon the ground solely that the policy described the location of the property insured as being in the "brick *and iron* building," which description applied to the "middle" building where there had been no loss.

The law applicable to the controversy here is too well settled to admit of discussion. In fact, there is practically no contention between counsel as to the law of the case, viz: that while a court of equity has jurisdiction to reform and enforce contracts of insurance on the ground of fraud or mistake, relief will not be granted in any case except where there is a plain mistake, clearly made out by satisfactory and unquestionable proof, or the fraud relied on is established by the same degree of proof. *Shenandoah Valley R. Co.* v. *Dunlap,* 86 Va. 346, 10 S. E. 239, and authorities there cited.

There is no question of fraud presented in the case under consideration, but purely a question of fact—namely, whether or not at the time the policy in question was issued J. B. Moore & Co., agents for appellants, and Straus & Son, agents for appellee, understood and intended that the policy should cover the stock situated in the corner building, which was destroyed by fire on December 31, 1901.

That this was the intention of J. B. Moore & Co. is not at all questioned, and therefore a consideration of the evidence only requires that we ascertain whether or not Straus & Son understood that they were to insure the stock in that building and intended to do so when they issued the policy.

As has been observed, the corner building and its stock had been previously insured in the Virginia Fire & Marine Insurance Company by two separate policies of $1,000 each, one on the stock and the other on the building; that these policies expired on the 15th day of December, 1901, and in both of them this building was described as "the two-story brick, tin

roof building, situated on the south side of Richmond dock, corner Seventeenth street, used as a warehouse." Straus & Son were informed of these facts, and of the further fact that the policies desired by J. B. Moore & Co. on December 13th were to take the place of the two policies in the Virginia Fire & Marine Insurance Company, which that company had declined to renew. It further clearly appears that on that day the location of the building, that is, the corner building, upon which the policies desired were to be placed, the one on the building and the other on its contents, was explained to Milton Straus, who called at the office of J. B. Moore & Co. to ascertain definitely the location of the property upon which insurance was desired, and in making the explanation reference was made to what is known among insurance people as the "City Insurance Map." At this interview between Milton Straus and J. B. Moore, the rates of insurance were fully discussed, and it appears that there was a book or tariff of rates governing insurance in the city of Richmond, in which every insured building was rated. Straus & Son are shown to be about the best informed insurance agents in the city of Richmond. The book or tariff of rates shows that the rate on this corner building was 1 1-4 *per cent.*; that the rate on the contents or stock was 1.60 *per cent.*; while the rate on the "middle" or sumac building prior to the removal of the sumac mill was 2.50 *per cent.*, and subsequent to its removal and at the time of the writing of the two policies hereinbefore spoken of it was 1.50 *per cent.* The rate charged upon the policy here in question was 1.60 *per cent.*, thus showing that Straus understood the location of the building, and that the stock to be insured was in that building, and fixed the rate which was the proper rate only for the stock contained therein. There is no question made that the rate charged upon the stock, etc., intended to be insured was the proper rate on the property as

located in the corner building, and would have been an improper rate to charge if it had been located in the "middle." building.

It is testified to by J. B. Moore, J. B. Moore, Jr., and G. L. Cook, the latter being the person who wrote the description or form ("slips") from which Straus & Son issued the two policies on December 13th, that the understanding and intention on their part was to insure the stock in the corner building. Milton Straus, of the firm of Straus & Son, admits that J. B. Moore informed him that these policies were intended to take the place of two similar policies which would soon expire in the Virginia Fire & Marine Insurance Company, and the only reason given by him for construing the policy here in question as applying to the stock in the middle building is that he was informed by Mr. Moore "that the only mechanical appliance in the 'middle' building was the power from the grist mill used in hoisting grain." The point made by Straus in his reason for that construction of the policy was that the corn or grist mill, being the "westernmost" building, was the building from which power would have to be obtained to run the machinery in the middle building, and that the power therefrom would not be likely to be transferred to the "easternmost" or lime warehouse (corner) building, on account of its distance, and that the clause in the policy granting "permission to hoist grain, etc.," could only refer to the "middle" building—the brick and iron building—it being contiguous to the grist mill. This contention of Straus loses its force entirely by reason of the fact that the clause granting "permission to hoist grain, etc.," is found in the policy issued by appellee through Straus, at the same time, on the "easternmost" (corner) building, which policy it never disputed but promptly paid after the fire occurred. No controversy arose as to the location of the property covered by the policy here in question until W. B. Robins,

a general insurance adjuster of Richmond, was sent to adjust the loss sustained by reason of the fire on the 31st of December, when in examining the policies issued by the companies he represented, including appellee, he discovered that by using the words "and iron" between the words "brick" and "building" in the policy in question, the description applied to the "middle" building instead of the corner building, as he construed it; and Milton Straus frankly admits in his testimony in the case that up to the time that he received this information from Robins, which was about ten days after the fire, he had supposed that the policy applied to the contents of the corner building, and that he had made a mistake in mapping the risk. He could not have supposed that the policy applied to the contents of the corner building if he had not intended that the policy, when issued on the 13th of December, was to cover the contents of that building. He therefore practically admits that he, as did J. B. Moore, intended and understood that the policies issued to appellants on December 13th, one on the corner building and the other on its contents, applied to that building and its contents. Robins is wholly unable to explain, nor does Straus attempt to explain, why Straus & Son should have charged the rate applicable only to the contents of the corner building, if it was intended that the policy should apply, and did in fact apply, to the contents of the "middle" building, except to suggest that at that time there was some confusion of rates by reason of legislation on the subject of insurance.

The facts, upon which appellee greatly relies, that the description of the building in the two policies was dissimilar, and that the application for insurance and the policy on the stock, etc., referred more clearly to the "middle" than to the corner building covered by the other policy, are not a sufficient reply to appellant's contention, that there was a mutual mistake, in the face of the evidence that appellee's agent, Straus, knew

(which he admits) that "both policies taken together were intended to protect a building and the stock in it"; that the application and policy on the building contained some expressions descriptive of the corner building and some descriptive of the "middle" building; that the policies were not issued till the applications therefor had been taken by Straus to J. B. Moore & Co., who explained to him that the insurance was desired on the corner building and its contents, and not the "middle" building, upon which appellee had already declined to place insurance, and that Straus "supposed" that the policy here in question applied to the stock in the corner building and thought he "had made a mistake in mapping the risk" until informed differently by Robins about ten days after the fire. After stating on cross-examination, "I thought the building and the stock were the same location," Straus was asked: "You understood, then, that the stock was contained in the building which was insured under the other policy?" Ans. "Yes, sir." Q. "Was it not your intention in issuing these two policies that the policy on the stock should cover that stock which was then contained in the building which was covered by the other policy?" A. "I understood so from the interview I had with Messrs. J. B. Moore & Co."

Under these circumstances, we are of opinion that there was a mutual mistake which should be corrected, and the policy in question reformed. The decree appealed from will, therefore, be reversed, and the cause remanded to the Chancery Court of the city of Richmond, to be further proceeded with in accordance with this opinion.

*Reversed.*