**MORRIS OIL CORPORATION, Plaintiff,**

v.

**MARYLAND CASUALTY COMPANY, Defendant.**

**Civ. A. No. 350.**

United States District Court
W. D. Virginia, Danville Division.

Oct. 20, 1955.

John D. Epperly, Broaddus, Epperly & Broaddus, Martinsville, Va., for plaintiff.

Edwin B. Meade, Meade, Talbott & Tate, Danville, Va., for defendant.

BARKSDALE, District Judge.

This action having been tried upon the facts without a jury, the court doth hereby find the facts specially and states separately its conclusions of law thereon, and directs the entry of the appropriate judgment:

Findings of Fact.

On July 1, 1952, plaintiff, Morris Oil Corporation, took over from one Booker the business of gasoline and oil distributor for American Oil Company near Martinsville, Virginia. J. A. Brodie, an insurance agent of Martinsville, who did business as Brodie-Yeaman Insurance Service, had previously solicited Robert Morris, President and principal stockholder of Morris Oil Corporation, for its insurance. Robert Morris had theretofore, as president of a hardware company and a building construction com-

pany, been dealing with Brodie since 1946, and had bought numerous policies of insurance of various kinds from him. Robert Morris knew little about insurance contracts, and relied on Brodie to secure for him the coverage which he wanted. On July 1, 1952, Brodie came to the office of Morris Oil Corporation and discussed with Robert Morris and Gilmer Morris the matter of the insurance coverage desired by Morris Oil Corporation. Robert Morris knew nothing of the oil business, while Gilmer Morris had been employed by Booker, the previous distributor, for some four years and was familiar with this business. After discussing public liability insurance on the two trucks, Gilmer Morris told Brodie that they should have "contamination" insurance, and that if they did not have "contamination" insurance they might as well not have any. Brodie asked if "contamination" insurance meant insurance against damage resulting from putting kerosene into gasoline tanks, and vice versa, and Gilmer Morris told him it did. Brodie said he was not too familiar with that type of insurance, but that he would see that Morris Oil Corporation was covered against that risk. Upon returning to his office, Brodie, as agent, issued a policy of liability insurance for Century Indemnity Company, which did not cover risks resulting from erroneous delivery of gasoline for kerosene, or kerosene for gasoline, if an accident should occur after delivery had been completed. An endorsement was attached to, and made a part of, the policy, which, so far as pertinent, reads as follows:

"Erroneous delivery of gasoline or oil.

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability and for Property Damage Liability with respect to accidents arising out of the erroneous delivery of gasoline for oil or oil for gasoline, or the delivery of gasoline or oil into the wrong receptacle, shall not apply if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof; provided, such operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement."

On July 2, 1952, one Martin, auditor for American Oil Company, while at the office of Morris Oil Corporation for the purpose of checking out Booker and checking in Morris Oil Corporation, inquired about insurance coverage, upon which he was required to report to American Oil Company. As Brodie had not delivered the insurance policy, which he had written for Century Indemnity Company, Martin talked to Brodie on the telephone and obtained the information which he needed for his report. American Oil Company did not require insurance covering the risks of misdelivery of products, but at the request of Robert Morris, Martin told Brodie that Mr. Morris was rather concerned over having coverage on erroneous delivery of products, and Brodie replied that he could rest assured that Mr. Morris was covered under all those circumstances. Later, higher limits of liability being desired, the Century Indemnity Company policy was cancelled and a new policy was issued by defendant, Maryland Casualty Company, on October 29, 1952, and this Maryland Casualty Company policy, by an identical endorsement, excluded risks resulting from erroneous delivery of products, as did its predecessor, the Century Indemnity Company, policy. This policy, upon the application of Brodie, was prepared by defendant's general agents in Staunton, Virginia, and sent to Brodie, who countersigned and delivered it to Robert Morris. However, before the issuance of the Maryland Casualty Company policy, it had been agreed by Robert Morris and Brodie that the new policy should have the same coverage as the old one, it being the understanding of both Robert Morris and Gilmer Morris that the coverage of the insurance included the risk of damage

from erroneous delivery of products. No one for Morris Oil Corporation read either policy when delivered. Coverage of the risk of misdelivery would have entailed a separate policy and an additional premium. I find as a fact that the officers of Morris Oil Corporation requested of Brodie, the insurance agent, insurance covering Morris Oil Corporation against the risks resulting from erroneous delivery of products, that Brodie promised to include such risks in the coverage of the insurance he issued, and that Morris Oil Corporation relied upon this promise. I further find that on October 29, 1952, Brodie was agent of Maryland Casualty Company, and was authorized to issue insurance covering the risk of misdelivery.

On or about August 2, 1953, Morris Oil Corporation sold and delivered to Wilson's Amoco, Axton, Virginia, certain gasoline and kerosene, and through inadvertence delivered white gasoline in the tank provided for kerosene. Some of the white gasoline was sold for kerosene to one Barker of Axton, which resulted in an explosion and fire. A claim for damages being asserted, defendant Maryland Casualty Company was promptly notified, but denied coverage. Actions for damages were instituted against Morris Oil Corporation on May 20, 1954, and when notified defendant Maryland Casualty Company denied coverage and declined to defend. On May 9, 1955, judgments were rendered against Morris Oil Corporation in these actions, aggregating $5,000, plus costs in the aggregate sum of $41.60, and for the defense of these actions Morris Oil Corporation paid the reasonable attorney's fee of $500.

### Conclusions of Law.

The purpose of this action is to reform a written instrument to make it conform to what is alleged to have been the true intent and understanding of the parties. If the written instrument be so reformed, then plaintiff would be entitled to the judgment it seeks. Fraud on the part of defendant's agent has been neither charged nor proved. Plaintiff contends that the failure of the written instrument to embody the true intent and understanding of the parties was due to a mutual mistake.

■ I quite agree with defendant's contention that a written contract is presumed to embody the true intent and understanding of the parties thereto, and that

"* * * the party alleging a mistake in a written instrument must show by evidence which leaves no reasonable doubt upon the mind of the court, not only of what the mistake consists, but the correction which should be made." Temple v. Virginia Auto Mutual Insurance Co., 181 Va. 561, 569, 570, 25 S.E.2d 268, 271.

In Newport News Shipbuilding & Dry Dock Co. v. Isherwood, 4 Cir., 5 F.2d 924, 927, 928, Judge Soper said:

"The jurisdiction of a court of equity to reform a written contract for mutual mistake, or for mistake on one side and fraud, deceit, or inequitable conduct on the other, is indisputable. But the purpose of a written contract is to furnish a record of the terms of the agreement of the parties not easily impeached, and thereby to avoid subsequent disputes and conflicting testimony and claims regarding its terms and their meaning. To accomplish this purpose, and to prevent such disputes from annulling written agreements, two rules have been firmly established in equity: First, that the burden is on the complainant to prove the mutual mistake, or the mistake of one party and the deceit, fraud, or inequitable conduct of the other, upon which he relies for a modification or avoidance of the contract; and, second, that, in view of the written record of the terms of the agreement made at the time a preponderance of the evidence is insufficient, and nothing less than evidence that is plain and convincing

beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement. * * * "

■ It seems to me that plaintiff has borne this heavy burden in this case. There is actually no substantial conflict in the evidence. The testimony of Robert Morris and Gilmer Morris is that Brodie was directed to include in the policy which he was to write for them, coverage against the risk of misdelivery of products, and that he promised to do so. Brodie, the only witness for defendant on this issue, never categorically denied that he was so requested and so promised. The most he said was that he did not recall such a conversation, and that he issued the insurance as requested by plaintiff. And to corroborate the testimony of the two Morrises, Martin, who was then auditor for American Oil Company, testified positively that, on the following day, in answer to his inquiry, Brodie told him on the telephone that Morris Oil Corporation was covered against the risk of erroneous delivery. It was stipulated that Brodie would deny that he made this statement, but he did admit that he had a conversation with Martin about the insurance. I cannot escape the conclusion, as set out in my findings of fact, that coverage of the risks resulting from erroneous delivery of products was requested by plaintiff's agents and promised by defendant's agent.

Of course, the discussion of coverage on July 1, 1952, was in regard to the original policy issued on behalf of Century Indemnity Company. However, whatever was agreed upon then, was also applicable to the later policy issued on behalf of defendant, Maryland Casualty Company, because there is no dispute about the fact that it was understood by all that the defendant's policy was to include the same coverage, the only change being in regard to the matter of limits of liability.

Assuming that Brodie promised the Morrises to cover the plaintiff against the risks of erroneous delivery, why then did he not do it? It was to his interest to do so, because he had so promised, and to do so would have resulted in a greater premium and a greater commission to him. I am constrained to the belief that the agent, Brodie, thought that the endorsement he put on the policy, which actually was an *exclusion* for all practical purposes of the coverage requested and promised, was an *inclusion* of the desired and promised coverage. The same endorsement attached to each policy is entitled in bold type, "Erroneous delivery of gasoline or oil.", and, so far as is pertinent, is quoted in my Findings of Fact.

While a careful reading of this endorsement shows clearly that, for all practical purposes, it excludes the risk of almost any accident which would result from misdelivery, a glance at the title printed in bold type, or a hasty or careless reading of the endorsement, might well indicate that it included the coverage desired and promised. But precisely what was in the mind of Brodie is immaterial. He promised to include in the policy coverage against risks resulting from erroneous delivery of products and on the following day reported to Martin that he had done so. It is therefore my conclusion that the failure of the policy to include coverage against the risk or damage which was here sustained, was the result of mutual mistake.

■ Having reached this conclusion, it seems clear to me that Virginia law, which, of course, governs my decision, requires a finding for the plaintiff. The case of Bankers' Fire Insurance Co. v. Henderson, 196 Va. 195, 83 S.E.2d 424, while not precisely on all fours, is quite analogous, and seems to me to be controlling. The court there held that, although the evidence was not sufficient to justify a finding of fraud on the part of the insurance agent, it was sufficient to prove a mutual mistake. The Court said, 196 Va. at page 205, 83 S.E.2d at page 430:

" * * * we are of opinion that the evidence clearly establishes that the complainants were entitled to

reformation of the policies upon the first principle stated in Shenandoah Valley R. Co. v. Dunlop, supra [86 Va. 346, 10 S.E. 239], that is, 'Where there has been an innocent omission * * * of a material stipulation, contrary to the intention of both parties, and under a mutual mistake.' "

The Court further said on the same page:

"A mistake of an agent concurred in by an insured is a mutual one affording a basis for reformation",

and 196 Va. at page 206, 83 S.E.2d at page 430, referred to a number of Virginia cases in which reformation had been decreed:

"There are many instances in this jurisdiction where policies have been reformed upon the application of this principle. Among them are, Warner Moore & Co. v. Western Assurance Co., 103 Va. 391, 49 S.E. 499, where through the mistake of the agent, despite the agreement of the parties, a policy was written to cover the wrong building; Temple v. Virginia Auto Mutual Ins. Co. supra, where through the mistake of the agent the policy, as written, failed to cover the motor vehicle agreed on; Universal Ins. Co. v. Mouel, 165 Va. 651, 183 S.E. 230, where through the mistake of the agent the owner of the property was stated to be the husband rather than the wife; Dickenson County Bank v. Royal Exchange Assurance of London, 157 Va. 94, 160 S.E. 13, 76 A.L.R. 1209, where through the mistake of the agent a standard mortgage clause was omitted from the policy."

This case seems particularly pertinent to me, by reason of two circumstances analogous to the instant case: if the policy issued had included the coverage contended for by the plaintiff, it would have carried a substantially greater premium than the premium paid, and the policy was not read by the insured.

The court said, 196 Va. at page 209, 83 S.E.2d at page 432:

"But aside from this, it is well settled that 'The negligent failure of a party to know or discover the facts, as to which both parties are under a mistake does not preclude rescission or reformation on account thereof.' Restatement of the Law of Contracts, Vol. 2, § 508, p. 977. See also, Dickenson County Bank v. Royal Exchange Assurance of London, supra, 157 Va. at page 111, 160 S.E. at pages 18, 19."

In Dickenson County Bank v. Royal Exchange &c., 157 Va. 94, 111, 160 S.E. 13, 18, the following quotations from Ruling Case Law and Corpus Juris are approved:

" 'The fact that insured accepted a policy of fire insurance without noticing a mistake is generally held not to preclude him from having the mistake corrected, even though he failed to read the policy over, or carelessly read it. Policies of fire insurance are rarely examined by the insured. The same degree of vigilance and critical examination would not be expected or demanded as in the case of some other instruments. * * *'

" 'Whether the failure of insured to read and examine the policy is such negligence on his part as defeats his right to a reformation depends on the facts and circumstances, it being sometimes held that there is negligence, but more often that there is not.' "

See also Massachusetts Bonding & Insurance Co. v. Piedmont Service Station, 165 Va. 167, 181 S.E. 397, and Temple v. Virginia Auto Mutual Insurance Co., 181 Va. 561, 25 S.E.2d 268.

Within the past year, this court has decided a case in which reformation of a life insurance contract was sought on the ground of mutual mistake. Botts v. Shenandoah Life Insurance Co., D.C., 134 F.Supp. 893. The prayer for reformation was denied. However, as point-

ed out in the opinion, the scope of the authority of a life insurance agent is very much less than that of an agent who issues fire, casualty and public liability insurance.

An order will be entered reforming the insurance contract which is the basis of this action, and rendering judgment for the plaintiff in accordance with the prayer of its complaint.