**MICHAEL ROSE PRODUCTIONS, Inc.,**
Plaintiff,

v.

**LOEW'S INCORPORATED, Paramount Film Distributing Corporation, Twentieth Century Fox Film Corporation, R.K.O. Radio Pictures, Inc., Warner Bros. Pictures Distributing Corporation, Universal Film Exchanges, Inc., Columbia Pictures Corporation and United Artists Corporation, Defendants.**

United States District Court
S. D. New York.
March 19, 1956.

D.C. 78, 168 F.2d 133; also United States v. Levin, D.C., 133 F.Supp. 88, and United States v. Stark, D.C., 131 F.Supp. 190.

Aaron E. Koota and Irving Perlin, New York City, for plaintiff. Francis T. Anderson, Philadelphia, Pa., of counsel.

Simpson, Thacher & Bartlett, New York City, for defendants other than Columbia Pictures Corp.

Schwartz & Frohlich, New York City, for defendant Columbia Pictures Corp.

HERLANDS, District Judge.

This motion by defendants, so far as it seeks summary judgment, raises two questions:

(1) Does the evidence submitted by plaintiff to explain and avoid its general release, which is pleaded as a defense by defendants to the present action, raise any genuine issue of fact?

(2) If there is no question as to the binding effect of the release, which had been executed in favor of two of the present defendants, does it inure to the benefit of the six other defendants in this antitrust conspiracy case, under the doctrine that the unconditional release of one joint tortfeasor operates to release the other joint tortfeasors?

This private, civil, antitrust treble-damage litigation began on August 12, 1954, when plaintiff filed its original complaint charging the following eight defendants with having engaged in a conspiracy "since January 1953" in violation of the antitrust laws, Clayton and Sherman Acts, 15 U.S.C.A. § 1 et seq.: Loew's Incorporated, Paramount Film Distributing Corporation, T. C. F. Film Corporation, R. K. O. Radio Pictures, Inc., Warner Bros. Pictures Distributing Corporation, Universal Film Exchanges Inc., Columbia Pictures Corporation and United Artists Corporation.

After various interlocutory proceedings, the action was discontinued with prejudice as to the defendant T. C. F. Film Corporation. An amended complaint, filed on December 1, 1954, added Twentieth Century Fox Film Corporation as a defendant, eliminated paragraph "9" of the original complaint, and amended paragraph "6" to read as follows:

"6. For many years past all the defendants, together with various motion picture exhibitors, have engaged in a nationwide conspiracy to fix runs and clearances, to exclude many independent exhibitors from the first run market in order to suppress competition with favored exhibitors, and to monopolize the business of exhibiting motion pictures on first run. Since January, 1953, this conspiracy has had the effect of depriving plaintiff of a supply of first run motion pictures of a quality suitable for exhibition at the Holiday Theatre."

Plaintiff seeks alleged damages arising out of its operation of the Holiday Theatre for the period January 1953 to the date of the commencement of this action, August 12, 1954.

All of the material allegations of the amended complaint have been denied by defendants in their answers.

The Holiday Theatre (formerly known as the Gotham Theatre) is located at Broadway and 47th Street, New York City. The plaintiff, a New York corporation, took over the management of this theatre "as of January 16, 1953," according to a letter sent by it on its letterhead under date of February 5, 1953 to United Artists Corporation (Exhibit "A," annexed to reply affidavit of Cyrus R. Vance). This February 5, 1953 letter states, in part:

"The new owners are, Michael Rose and Irving Perlin, who are op-

erating the Holiday under the trade name Michael Rose Productions, Inc.

\* \* \* \* \*

"We would like to have the opportunity of screening your future picture releases, and also would like to be advised, by mail, of any future screenings."

"The letter is signed as follows:

"Michael Rose Productions, Inc.

"Michael Rose

"President

"Irving Perlin

"Secretary & Treasurer"

The Vance affidavit states, on information and belief, "that an identical letter was sent on or about that date [February 5, 1953] to all the other defendants in this action."

Irving Perlin is an attorney. The general release involved in this case, executed and acknowledged by plaintiff (through "Sam M. Rose, president") on February 5, 1954, was prepared by Mr. Perlin, as appears from the face of the release (Exhibit "A," annexed to the moving affidavit of Albert C. Bickford). Mr. Perlin has acted as one of the plaintiff's attorneys of record from the commencement of this litigation.

On January 3, 1956, all of the defendants except Columbia Pictures Corporation (which subsequently joined in the motion) moved:

(A) For leave to amend their answers, Fed.Rules Civ.Proc. Rule 15, 28 U.S.C.A., by pleading the following additional defense based upon a general release:

"1. On or about February 5, 1954, plaintiff for good and valuable consideration duly executed and delivered to defendants United Artists Corporation and Loew's Inc. a general release in writing whereby plaintiff duly released the said defendants and forever discharged them from any and all claims which plaintiff then had or might thereafter have against them by reason of any matter, cause or thing from the beginning of the world to the date of the execution of the said general release. A copy of said general release is annexed hereto as 'Exhibit A'.

"2. By reason of the foregoing, the claims of plaintiff alleged in the amended complaint herein were discharged and forever released."

(B) For summary judgment based upon the proposed additional affirmative defense.

(C) For such other and further relief as the Court may deem just and proper in the premises.

Upon the oral argument of the motion, the Court granted leave to amend the answer. Accordingly, this opinion deals with the other branches of the motion.

The general release upon which the affirmative defense is predicated was typewritten upon a standard "Julius Blumberg, Inc." printed form. It was executed and acknowledged on February 5, 1954 by plaintiff through "Sam M. Rose," as president. Although there is no reference in any of the affidavits to the subject, a visual inspection and comparison of the handwritings of "Sam M. Rose" and "Michael Rose" would strongly indicate that they are identical; and that the two names, in all probability, refer to the same person. In any event, that question of identity does not have controlling importance with respect to the disposition of this motion.

The title page of the release contains the following notation:

"Irving Perlin
217 Broadway
New York 7, N. Y."

According to usage and pratice, that notation would indicate that Mr. Perlin was the attorney who prepared the release.

At this point, it is appropriate to observe that, although Mr. Perlin is both a principal and an attorney for plaintiff and has intimate knowledge of the general release and the circumstances leading to its execution, he has not seen fit to submit his affidavit in opposition to the motion at bar.

The body of the release reads as follows:

"To all to whom these presents shall come or may concern, Greeting: know ye, That Michael Rose Productions, Inc. a corporation organized and existing under and by virtue of the laws of the State of New York for and in consideration of the sum of five thousand one hundred fifty dollars ($5,150.) lawful money of the United States of America to it in hand paid by United Artists Corp., United Artists Theatre Circuit, Inc., Loew's Inc. and Loew's International Corp. the receipt whereof is hereby acknowledged, has remised, released and forever discharged, and by these presents does for itself and its successors, remise, release and forever discharge the said United Artists Corp., United Artists Theatre Circuit, Inc., Loew's Inc. and Loew's International Corp. their heirs, executors and administrators, successors and assigns of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialities, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, in admiralty, or in equity, which against them it ever had, now has or which it or its successors hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents.

"This release may not be changed orally."

Plaintiff does not dispute executing the above release. It contends, however, that the release was intended to relate only to an action in the New York Supreme Court, County of New York, for breach of contract which plaintiff, for $5,150 (the consideration recited in the release) discontinued against United Artists Corporation and Loew's Incorporated, two of the present defendants, in whose favor the release was executed. Plaintiff's opposing affidavit attempts to detail the circumstances under which the release was executed and delivered. In pursuance of this attempt, plaintiff quotes at length from an affidavit of one Bernard G. Kranze, general sales manager of United Artists Corporation, which affidavit United Artists Corporation filed in the state Supreme Court action. From the Kranze affidavit, the following facts appear:

In October 1953, United Artists Corporation entered into an "exhibition" agreement with plaintiff covering a motion picture entitled "The Joe Louis Story." By the terms of that agreement, plaintiff was to have an exclusive and indefinite "run," i. e., plaintiff had the right to exhibit the motion picture for as long as it desired to do so, and this right was to be exclusive for the period during which plaintiff would exhibit the motion picture.

Subsequently, United Artists Corporation entered into negotiations with Loew's Incorporated for the exhibition of "The Joe Louis Story" in all of the Loew's theatres in the New York City metropolitan area. In the course of these negotiations, it developed that it was highly desirable for Loew's to have that film by November 25, 1953, in view of Loew's other film bookings. Thereupon, United Artists unsuccessfully attempted to persuade plaintiff to waive its right to an exclusive and indefinite run. After plaintiff commenced the action for breach of contract, plaintiff agreed to waive its right in consideration of the payment of $5,150, this amount representing one-half of the total film rental cost of $10,000, plus city sales tax.

The portion of Kranze's affidavit quoted by plaintiff does not, explicitly or expressly, deal with the matter of the general release and the intention of the parties with respect to its scope or coverage.

Plaintiff's answering affidavit asserts:

"6. Throughout the entire course of the abovementioned litigation, from the institution of the action to and including the execution and delivery of the said release, the only claim mentioned or considered by any of the parties was the above-described claim for breach of contract and no party or person mentioned or considered the claim made in the pending action in any way or in any connection whatsoever."

Defendants submit photostatic copies of letters, dated November 2 and November 3, 1953, which were sent by plaintiff to defendants Loew's Inc., Twentieth Century Fox Film Corporation and Columbia Pictures Corporation and received by them (Exhibits "B," "C," and "D" annexed to the Vance reply affidavit). These letters were signed by "Michael Rose," presumably the same person as "Sam M. Rose," who executed the general release.

Paragraph "4" of each of the above-referred to letters states:

"Failure of your company to negotiate with me on the type of picture that is considered Broadway show case products will be considered in the opinion of this writer to be contrary to the laws of the U. S. Government, and this writer will take whatever steps are deemed necessary to protect its interest. Again may I repeat, that as of this date any pictures that are to be shown by your company on Broadway first-run unless these pictures have been publicised to the public that they will be shown at such given theatre prior to the date of this letter will be considered by this writer as pictures that we shall be given the opportunity to negotiate on equal terms on same. If we are not given the opportunity to negotiate on equal terms on same, we will consider this as a violation of the Sherman Anti-Trust Law and act accordingly."

The defendants have thus submitted strong proof that the matter of anti-trust litigation by plaintiff must have been within the contemplation of the parties when the general release was executed and delivered on February 5, 1954, only three months after plaintiff's threatening letters had been sent.

There is no suggestion by plaintiff that the alleged conspiracy, which is the subject-matter of the pending action, is materially different from the conspiracy which was the subject-matter referred to in plaintiff's letters.

■ The terms of the general release are clear and unambiguous. Plaintiff is barred from offering any proof to vary those terms by assertions as to plaintiff's intentions or the intentions of the two defendants at bar who received that release.[1]

However, the parol evidence rule does not prevent proof of "mutual mistake" in the execution of the release.[2]

[1] 9 Wigmore, Evidence §§ 2413, 2415 (3rd ed. 1940).

[2] 3 Corbin, Contracts § 580; p. 257 ff. (1951); 5 Williston, Contracts § 1552, p. 4350 (Rev. ed. 1937); 9, Wigmore, Evidence § 2417, p. 59 (3rd ed. 1940). Wigmore states:

"The kind of mutual mistake involved in the present principle is purely a mistake as to the *actual words intended to form part of the act,* * * *. This sort of mutual mistake * * * is common enough in written acts. The case is the simple one of an oral agreement which, when reduced to writing for signature, contains terms varying from the actual understanding of the parties, but is nevertheless signed by them both in ignorance of the variance. No one appears ever to have doubted that in such cases the instrument should be judicially amended to represent the actual agreement."

Where a party alleges mutual mistake, some courts have set up special rules relating to that party's burden of proof and the quantum of proof. Morris Oil Corporation v. Maryland Casualty Company, D.C.1955, 136 F.Supp. 63. In the latter case, the Court said at pages 65–66:

" 'To accomplish this purpose, and to prevent such disputes from annulling written agreements, two rules have been

The plaintiff's answering affidavit is susceptible to the interpretation that plaintiff is contending that there was a "mutual mistake." Although the word "mistake" is not used by plaintiff, a possible, though weak, inference from what plaintiff does allege is that this is a case of "mutual mistake."

■ It cannot be said that plaintiff's assertion of mutual mistake is incredible as a matter of law, or that the issue is futile. If the possibility of mutual mistake were "frivolous," then summary judgment would be proper. See De Luca v. Atlantic Refining Co., 2 Cir., 1949, 176 F.2d 421, 423.

This Circuit has adopted the liberal policy of granting the parties the opportunity to develop the full facts.[3] While that policy has been sharply criticized (see Wright, Rule 56 [e]: A Case Study On The Need For Amending The Federal Rules, 69 Harv.L.Rev. 839, 856, esp. notes 60, 62, 63 [March 1956]), it determines the judicial perspective in which this case must be viewed.

In Slagle v. United States, 5 Cir., 1956, 228 F.2d 673, 679, the Court said:

"Proper practice would suggest that the motion to dismiss be overruled and that appellants be given reasonable time after the issues have been clarified by answer, to pursue the salutary processes provided by the rules for discovering

and presenting proof upon those issues. The clearing of court dockets is one of the desiderata in the judicial function. But it should not be allowed to become a fetish for it does not rank with the *raison d'être* of courts,—the administration of justice based upon a full and fair disclosure of the facts."

In a similar vein, Judge Learned Hand, dissenting, in California Apparel Creators v. Wider of Cal., 2 Cir., 1947, 162 F.2d 893, 903, 174 A.L.R. 481, said:

"Indeed, when I see, as I am constantly seeing more and more, the increasing disposition to make use of that remedy [summary judgment], I cannot help wondering whether there is not danger that it may not rather impede, than advance, the administration of justice. It is an easy way for a court with crowded dockets to dispose of them, and the habit of recourse to it readily becomes a denial of that thorough, though dilatory, examination of the facts, on which justice depends even more than upon a studious examination of the law; for a mistake of law can always be reviewed. Speed and hurry ought to be antipedes of judicial behavior."

In considering the weight of the evidence, this Court finds it difficult to perceive any merit to plaintiff's attempt to

---

firmly established in equity: First, that the burden is on the complainant to prove the mutual mistake, or the mistake of one party and the deceit, fraud, or inequitable conduct of the other, upon which he relies for a modification or avoidance of the contract; and, second, that, in view of the written record of the terms of the agreement made at the time a preponderance of the evidence is insufficient, and nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement. * * * ' "

3. Since proof of mutual mistake involves, to a great extent, evidence of subjective facts, the courts have tended to deny summary judgment in such cases. Alvado v. General Motors Corporation, 2

Cir., 1955, 229 F.2d 408 where Circuit Judge Frank quoted with approval Chief Judge Hutcheson, who said in Alabama Great Southern Railroad Co. v. Louisville & Nashville Railroad Company, 5 Cir., 1955, 224 F.2d 1, 5:

"In many recent cases, where motive intent, subjective feelings and reactions, consciousness and conscience were to be searched, and examination and cross-examination were necessary instruments in obtaining the truth, we have pointed out that and why the issues may not be disposed of on summary judgment. Other courts have done the same. In Subin v. Goldsmith, 2 Cir., 224 F.2d 753, the majority opinion in a thorough going exposition of why a summary judgment should, and should not, be granted in cases of this general nature, collects and cites the controlling authorities."

avoid its general release. But the Court is now confronted, not with a motion for a directed verdict after trial, but with a motion for summary judgment before trial.

The vague and circumlocutory character of plaintiff's answering affidavit scarcely measures up to the standard of pleading required by F.R.C.P., Rule 9 (b). A fortiori it does not meet the criteria of proof prescribed by Rule 56. The combined effect of these two Rules is to impose upon plaintiff the obligation of stating with particularity the circumstances constituting the alleged mutual mistake, and to prove such facts by admissible evidence.

Plaintiff's answering affidavit contains overtones of "mutual mistake," Although such overtones may approach the supersonic, the Court cannot shut its ear to them. On the present state of the record, this Court is disinclined to grant summary judgment.

However, defendants should not be exposed to the expense and trouble of extensive trial preparation and a protracted trial unless and until the preliminary issue of the alleged mutual mistake in the execution of the general release has been adequately tested by a motion for summary judgment.

The Court has the power (Rule 56 [e] and [f]) to "permit affidavits to be supplemented or opposed by deposition or by further affidavits" and to "make such other order as is just." Cf. Bernstein v. Herren, D.C.S.D.N.Y.1955, 136 F.Supp. 493, 499.

The Court therefore directs [4] that depositions be taken (upon such terms and conditions and at such times and places as may be set forth in the order to be settled herein) of those representatives of plaintiff and defendant who have personal knowledge of the execution of the general release and the circumstances leading to its execution. Such depositions are to be completed within thirty days from the date of the order to be settled herein. They are to be confined strictly to the issue of alleged mutual mistake.

This Court will reserve continuing jurisdiction over this matter. Upon the completion of such depositions this Court will then be in a position to determine, upon a more complete factual record, whether or not plaintiff's assertion of mutual mistake is sham and frivolous or whether it raises a genuine issue of fact.

The present motion will be denied without prejudice to its renewal by defendants, if so advised, upon the amplified record indicated above. In this manner, the rights of plaintiff will be protected; and defendants will be spared the costs and trouble incident to protracted litigation if defendants are correct in their assertion that there is no bona fide issue of mutual mistake. If plaintiff does not succeed in impeaching the release, that release would serve to exonerate all of the defendants herein, upon the familiar principle that the release of one joint tortfeasor releases the other joint tortfeasors.[5]

By utilizing the above-indicated method of pretrial depositions, plaintiff will

4. The procedure adopted is a variant of the method frequently utilized in dealing with similar problems. Cf. Wadler v. Mediterranean Lines, Inc., D.C.S.D. N.Y.1954, 18 F.R.D. 322; Weinberger v. Toms River Express, Inc., D.C.E.D.Pa. 1951, 135 F.Supp. 872.

5. Combined Bronx Amusements, Inc. v. Warner Bros. Pictures, Inc., D.C.S.D. N.Y.1955, 132 F.Supp. 921.

The doctrine that the release of one joint tortfeasor releases all is the settled common-law view, although it has been criticized and the proposed Uniform

Contribution Among Tortfeasors Act would change the rule. 9 Uniform Laws Annotated, p. 156 ff. (1951), Uniform Contribution Among Tortfeasors Act § 4 and Commissioners' Note; Prosser, Joint Torts And Several Liability, 25 Calif. L.Rev. 413, 422–425 (1937). At present, the result of releasing all joint tortfeasors is obviated by the use of a covenant not to sue with a reservation of rights against the other joint tortfeasors. Lysfjord v. Flintkote Co., D.C. S.D.Cal.1955, 135 F.Supp. 672 (where such a covenant was used in a private anti-trust case).

not be permitted to reserve its evidence until the trial and thus render useless "the very valuable remedy of summary judgment," which is designed to determine whether the issues formally raised are "in fact sham or otherwise unsubstantial." Engl v. Aetna Life Ins. Co., 2 Cir., 1943, 139 F.2d 469, 473.

Motion denied without prejudice. Settle order on notice.